IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| ALBERT PATTERSON d/b/a | ) | |
| WORLD WRESTLING ASSOCIATION, | ) | |
| SUPERSTARS OF WRESTLING, INC. and | ) | |
| d/b/a W.W.A. SUPERSTARS | ) | |
| | ) | |
| Plaintiff | ) | No. 04 C 0192 |
| | ) | |
| v. | ) | |
| | ) | |
| TVN ENTERTAINMENT CORPORATION, | ) | JURY TRIAL DEMANDED |
| GENERAL COMMUNICATIONS, INC., | ) | |
| EBATES SHOPPING.COM, INC., | ) | |
| MUSCATINE POWER & WATER (MPW) CABLE | ) | MAGISTRATE JUDGE |
| AMAZON.COM, INC., EPINIONS.COM | ) | WILLIAM E. CALLAHAN |
| PPVN NETWORK HOLDING, INC. | ) | |
| PAR-PER-VIEW NETWORK. INC. | ) | |
| TNA ENTERTAINMENT, LL.C. and | ) | |
| MUZE, INC. | ) | |
| Defendants | ) | |

PLAINTIFF'S STATEMENT OF FACTS IN OPPOSITION TO DEFENDANT TNA'S
MOTION FOR SUMMARY JUDGMENT

Plaintiff  filed a Statement of Uncontested Facts in Opposition to Defendant's Motion for

Summary Judgment.  While this is a new Statement of Facts in Response to Defendant's Second

Motion for Summary Judgment, the first 114 facts are identical to the 114 Facts stated in

response to Defendant's First Motion for Summary Judgment. Additional Facts begin  at Fact

115.

1.  Plaintiff registered the mark SUPERSTARS OF WRESTLING SW and

SUPERFSTARS OF WRESTLING with the United States Department of Commerce, Patent and

Trademark Office under Registration Number 1857015 on October 4, 1994.  A copy of the

1

Notice of Acceptance of Registration under 15 U.S.C. 1058(a)(1) from the United States

Department of Commerce Office of Patents and trademarks dated April 20, 2000 is attached as

Exhibit F to the Complaint.     The mark SUPERSTARS OF WRESTLING is for entertainment

services in the nature of televison programs featuring wrestling.  P. Exhibit 1.

2.  On March 30, 2000 World Wrestling Federation Entertainment, Inc's registration of

the mark WWF SUPERSTARS under IC 41 with respect to entertainment services, namely

television program featuring wrestling exhibitions and other related entertainment and the live

performances by professional wrestlers/entertainers under registration number 1,819,240 was

cancelled on the petition of Albert Patterson  with the finding by Lynne G. Beresford, Deputy

Commissioner for Trademark Policy in relevant part that,

> "Whereas it appears from the records of this office that the petitioner *(Patterson)* is the
> owner of trademark registration 1819240 and has complied with the provisions of Section
> 7(e) of the Trademark Act of 1946 and the Examiner of Trademarks has recommended
> the cancellation thereof.

P Exs 3 & 4.

3.  Patterson became involved with the wrestling entertainment business with Justi

Fontaine in Milwaukee in 1969.   When Justi Fontaine died in 1974, Patterson took over the

business because the family didn't want the wrestling work.  P Ex 2, Patterson Affidavit #1.

In 1979, Patterson first used the tradename SUPERSTARS OF WRESTLING in connection with

his wrestling entertainment events.  P Ex 2, Patterson Affidavit # 1, 3.

4.  From 1978 through 1985, Patterson principally presented his productions through the

tradenames United Wrestling Association and SUPERSTARS OF WRESTLING.  P Ex 2,

Patterson Affidavit # 4.  P Ex 11.

5.  The marks SUPERSTAR WRESTLING, SUPERSTARS OF PRO WRESTLING,

2

SUPERSTARS OF WRESTLING were first used by Mr. Patterson in commerce in 1979.

6. Plaintiff's Exhibit 11 includes United Wrestling Association posters and advertisements of events Patterson produced. These events were presented under the tradenames SUPERSTARS OF WRESTLING, SUPERSTAR WRESTLING AND SUPERSTARS OF PRO WRESTLING. P Ex 2, Patterson Affidavit #5.


7. In 1983 the United Wrestling Association using SUPERSTARS OF WRESTLING first broadcast wrestling entertainment on Channel 24 in Milwaukee. P Ex 2, Patterson Affidavit # 7.

8. After United Wrestling Association went bankrupt on October 31, 1985, Patterson continued to promote wrestling entertainment events under SUPERSTARS OF WRESTLING. P Ex 2, Patterson Affidavit # 13.

9. Albert Patterson purchased all of the assets of United Wrestling Association on or about December 7, 1992 for $9,500. In purchasing the assets of United Wrestling Association, Patterson also purchased the tradenames used by United Wrestling Association including but not limited to SUPERSTARS OF WRESTLING, SUPERSTARS WRESTLING and SUPERSTARS OF PRO WRESTLING. P Ex 15, bill of sale from UWA to Albert Patterson dated Dec 7, 1992.

10. . The court order in the litigation between Titan Sports, Inc and Albert Patterson reflects that defendant settled with Louis Jones as Trustee for the WORLD WRESTLING ASSOCIATION d//b/a as successor in interest to the United Wrestling Association. P Ex 16, Court Order enjoining Titan Sports from using SUPERSTARS OF WRESTLING, SUPERSTARS OF PRO WRESTLING AND SUPERSTAR WRESTLING pursuant to a settlement with the WORLD WRESTLING ASSOCIATION, INC.

11. King Kong Enterprises, a company owned by Patterson, started using the tradename WORLD WRESTLING ASSOCIATION and WWA. P Ex 2, Patterson Affidavit #14. This

3

tradename had been used since 1978 in magazines published by Patterson and sold at events. P Ex 12

12. In 1987 videos and magazines relating to Patterson's shows were registered under television programs filed with the Library of Congress in 1987. P Ex 2, Patterson Affidavit # 15.

13. Plaintiff first incorporated WORLD WRESTLING ASSOC. (W.W.A.) INC. in the State of Wisconsin on June 24, 1988. The name of WORLD WR ESTLING ASSOC, (W.W.A.) INC. was changed to WORLD WRESTLING ASSOCIATION SUPERSTARS OF WRESTLING, INC in 1993. P. Ex 13.

14. King Kong Enterprises adopted WWA Superstars of Pro Wrestling on July 19, 1989. P Ex 14.

15. Beginning in 1989 the caps sold at events bore the mark WORLD WRESTLING ASSOC.TM "W.W.A. Superstars" TM. P Ex 2, Patterson Affidavit #17.

16. T-shirts and caps were generally sold at Patterson's live events. After 1989 until the present, the T-shirts bore the mark WORLD WRESTLING ASSOCIATION SUPERSTARS OF WRESTLING. P Ex 2, Patterson Affidavit # 18.

17. Normally, T-shirts were sold for $10.00 a shirt. On occasion such T-shirts were distributed as promotional item for advertisers free to people purchasing tickets to the events. For example, Jesse Reed on occasion provided free T- shirts as an advertising promotion for his furniture store in Milwaukee, WI. P Ex. 2, Patterson Affidavit # 18.

18. The first use of the marks WWA and WORLD WRESTLING ASSOCIATION on television was on June 6, 1992 when Patterson ran a wrestling entertainment television show beginning June 6, 1992 until December 1993 on Channels 55 on Warner Cable, channel 43, Waukeshaw, WI using the marks WWA and WORLD WRESTLING ASSOCIATION. The

4

shows also appeared in Beloit WI and Rockford, Illinois  metropolitan areas on Channel 49,

Channel 26 in Madison and Appleton, WI on channel 26 and in Green Bay, WI on Channel.   The

tradenames SUPERSTARS OF WRESTLING and WWA SUPERSTARS appeared on all of

these broadcasts.   P Exs 17, 18, 19, 32; P Ex. 2, Patterson Affidavit # 20.  P Ex 43 Program on

DVD.

19.  The ring announcer Naboisek using the name David Starr announced the show

as,"World Wrestling Association Superstars of Wrestling, Incorporated present WWA Superstars

of Wrestling live."  P Ex. 2, Patterson Affidavit # 20.

20.  In Aug 1992 WWA SUPERSTARS OF WRESTLING presented a live wrestling

entertainment event at Afro Fest.  The attendance was at least 1,500.  P Ex. 2, Patterson Affidavit

# 21.

21.  With respect to pay per view television, the first use of the marks WORLD

WRESTLING ASSOCIATION and WWA was on June 5, 1992 in a program entitled WWA

SUPERSTARS OF WRESTLING.     Ex. 2, Patterson Affidavit # 22.

22.  A series of press releases publicized the TV broadcasts during 1992 including a  May

19, 1992 press release that World Wrestling Association was returning  to the air;  a July 17,

1992 Press Release  by W.W.A. Wrestling announcing Superstars of Wrestling at Afro Fest

August 1, 1992 and on Channel 49;  a press release by the World Wrestling Association that

superstars of Wrestling will air on Channel 43 and Channel 49 on October 31, 1992. P Ex 17.

23. Video Tapes were recorded and played on 6/6/92 and again on 5/10/93 on Channels

49 and 51 using the mark WWA Superstars.  P Ex 18, TV 49 re June 6 to August World

Wrestling Association Broadcast;  P Ex 19,  Confirming broadcast on TV 43.

24.  Patterson advertised a show at the Mecca Auditorium on May 1, 1993 using WWA

SUPERSTARS OF WRESTLING.  P. Ex 21.

25. Patterson produced a live show in Waukesha, WI in February of 1993 at the Waukesha Expo Center using the tradenames W.W.A. SUPERSTARS OF WRESTLING and WWA SUPERSTARS with SW in the middle at the event. The show was taped for broadcast on television and pay per view. P Ex. 2, Patterson Affidavit # 24. Plaintiff's DVD Exs 43, 46.

26. The name of the show on TV was WWA SUPERSTARS OF WRESTLING, WORLD WRESTLING. P Ex. 2, Patterson Affidavit # 24. P Ex 43, 46.

27. Contracts for the February 1993 show were signed by the WORLD WRESTLING ASSOCIATION with major wrestling talents including Nailz, Hercules, the Killer Bees (Brian Blair and Jim Brunzell), Cowboy Bob Orton and the Midgets. P Ex 23. P Ex. 2, Patterson Affidavit # 25.

28. In Aug 1993 WWA SUPERSTARS OF WRESTLING presented a live wrestling entertainment event at the African World Festival (Afro Fest). The attendance was at least 1,500. P Ex. 2, Patterson Affidavit # 26.

29. Patterson Produced a live wrestling entertainment show every day in Detroit, MI on August 6-8, 1993 at the Jubilee Festival. P Ex. 2, Patterson Affidavit # 27. P Ex 25. Poster for Jubilee Festival in Detroit August 6-8, 1993.

30. The events over the three days in Detroit were taped live for broadcast on pay per view for Labor Day world wide. The mark "WORLD WRESTLING ASSOCIATION SUPERSTARS OF WRESTLING, INC. was used. Pay per view broadcasts were on the pay per view channels on national pay view in 1993 by Keystone (now Globcast). The cost to watch the show was $19.95 on pay per view. Ex 2 Patterson Affidavit # 28. P Ex 24.

31. Mr. Patterson has also used and licensed the marks SUPERSTARS OF WRESTLING in Australia. P. Ex 26.

32. Patterson held a WWA SUPERSTARS OF WRESTLING press conference on on April 8, 1993.

6

33. Patterson registered the mark SUPERSTARS OF WRESTLING SW AND DESIGN in class 041 on October 4, 1994 with Registration Number 1857015. P Ex 1.

34. In Aug 1994 Patterson presented a WWA SUPERSTARS OF WRESTLING event at Afro Fest with approximately 1,500 in attendance. P Ex. 2, Patterson Affidavit # 30.

35. In Aug 1995 Patterson presented a WWA SUPERSTARS OF WRESTLING event at Afro Fest with approximately 1,500 in attendance. P Ex. 2, Patterson Affidavit # 31.

36. World Wrestling Association Superstars of Wrestling, Inc. performed at the Eagles Club in Milwaukee, WI in September of 1995. P Ex. 2, Patterson Affidavit # 32. P Ex 63.

37. Patterson presented shows at the Eagles Auditorium Sept 17, 1995 and November 26 and Dec 3, 1995. P Exs 27, 28 The show featured the mark WORLD WRESTLING ASSOCIATION SUPERSTARS OF WRESTLING, INC P Ex. 2, Patterson Affidavit # 32. P Exs 27, 28, 63.

38. In Aug 1996 Patterson presented a WWA SUPERSTARS OF WRESTLING event at Afro Fest with approximately 1,500 in attendance. P Ex. 2, Patterson Affidavit # 33. P Ex 29, June 12, 1996 letter Re Afro Fest..

39. In Aug 1997 Patterson presented a WWA SUPERSTARS OF WRESTLING event at Afro Fest with approximately 1,500 in attendance. P Ex. 43, Patterson Affidavit # 34

40. World Wrestling Association Superstars of Wrestling, Inc. performed at the Eagles Club in Milwaukee, WI in 1997. The show featured the mark WORLD WRESTLING ASSOCIATION SUPERSTARS OF WRESTLING, INC. P Ex. 2, Patterson Affidavit # 35. P Ex 36.

41. In Aug 1998 Patterson presented a WWA SUPERSTARS OF WRESTLING event at Afro Fest with approximately 1,500 in attendance. P Ex. 2, Patterson Affidavit # 36.

42. The Eagles Club show in 1998 was taped and broadcast on Channel 13 cable TV which ran throughout Central, WI. in 1998. P Ex 35 Eagle Club advertisement Sept 1998

7

World Wrestling Assoc.    P Ex. 2, Patterson Affidavit # 37.

43.   World Wrestling Association Superstars of Wrestling, Inc. performed at the Eagles Club in Milwaukee, WI.   The show featured the mark WORLD WRESTLING ASSOCIATION SUPERSTARS OF WRESTLING, INC  in 1998.   P Ex 35, Sept 1998 ad for World Wrestling Assoc "WWA Superstar" TM at Eagles auditorium.

44. On June 19, 1999 Patterson presented a WWA SUPERSTARS OF WRESTLING event at The June 19 Fest with approximately 2,500 in attendance.  P Ex. 2, Patterson Affidavit # 38 .

45.  On June 19, 2000 Patterson presented a WWA SUPERSTARS OF WRESTLING event at The June 19 Fest with approximately 2,500 in attendance.  P Ex. 2, Patterson Affidavit # 39.

46.  In 1999 and 2000 the World Wrestling Association Superstars of Wrestling did four co-performances with Rampage Wrestling.    The marks World Wrestling Association Superstars of Wrestling were used.  World Wrestling Association Superstar Jeff May entertained at some of the shows.  The banners on the ring said WWA Superstars of Wrestling.  P Ex. 2, Patterson Affidavit # 40.

47. In June of 2000 World Wrestling Association Superstars of Wrestling  performed an event at the Puerto Rican Fair.  After this, annual event were performed at the Puerto Rican Fair. through 2003. P Ex. 2, Patterson Affidavit # 41.

48.  Resort Live, Inc,. through a license granted by Patterson, used the marks SUPERSTARS OF WRESTLING in all 50 states of the United States and 25-50 countries.. Resort Live also broadcast WORLD WRESTLING ASSOCIATION and WWA in connection with some of these events.   Resort Live, Inc. broadcast its programs on pay per view TV. Specifically, the mark     Superstars of Wrestling was used by Resort Live, Inc pursuant to a license from Albert Patterson in Green Bay, WI in August 2000; Oroville, CA in August 2000;

Truloc, CA in August 2000; Wollongong, Australia July 2000; Brisbane, Australis July 2000; Sydney, Australia July 2000; Perth, Australia  August 2000; Hobart, Australia August 2000; Adelaide, Australia   August 2000; and Melborne, Australia August 2000. P Ex 2, Patterson Affidavit # 42.  P Exs 6, 7, 8.

49.   The mark SUPERSTARS OF WRESTLING  was used in the shows.   See also P Ex 8  Patterson d/b/a World Wrestling Association license to Resort Live to use the mark SUPERSTARS OF WRESTLING.

50.   As authorized under the license agreement with Resort Live, Inc. a show featuring Dennis Rodman was aired using the marks WORLD WRESTLING ASSOCIATION, WWA AND SUPERSTARS OF WRESTLING, marks licensed by Patterson throughout the United States and in 25-50 countries throughout the world beginning December 26, 2000 at 8:30 p.m. The show was re-broadcast about 50 times throughout the United States over the next few months.   P Ex. 2, Patterson Affidavit # 43; P Ex 6, 7 and 8.  P Ex 80 Tape of the WWA event featuring Rodman.

51.   Patterson registered the mark SUPERSTARS OF WRESTLING in Sydney, Australis on October 14, 2002 with trademark number 867300.  P Ex 26.

 52.   On June 19, 2001,  World Wrestling Association Superstars of Wrestling, Inc. performed  an event at the Martin Luther King Center in Milwaukee, WI on Martin Luther King Drive using the marks WORLD WRESTLING ASSOCIATION SUPERSTARS OF WRESTLING .T-Shirts bearing the marks SUPERSTARS OF WRESTLING  WWA SUPERSTARS were given away by Reed Furniture which was a sponsor of the event.   Ex. 2, Patterson Affidavit # 44.

53.   Patterson filed an application to register WORLD WRESTLING ASSOCIATION with the United States Patent and Trademark Office.  P Ex. 2, Patterson Affidavit # 51. P Ex 38.

9

54. The World Wrestling Association Superstars of Wrestling, SUPERSTARS OF WRESTLING performed a wrestling entertainment event at the Puerto Rican Fair on June 19, 2002. P Ex. 2, Patterson Affidavit # 45.

55. Albert Patterson directly used the mark "WORLD WRESTLING ASSOCIATION SUPERSTARS OF WRESTLING, INC. on June 7, 2002 at 3:00 p.m. at an event at the United Community Center in Milwaukee, WI. P Ex. 2, Patterson Affidavit # 46.      P Ex 31 Gospel Night June 7 (2002) wrestling.

56. The World Wrestling Association Superstars of Wrestling, Co. performed a wrestling entertainment event at the Puerto Rican Fair on June 19, 2002. Ex. 43, Patterson Affidavit # 45.

57.     Albert Patterson directly used the mark "WORLD WRESTLING ASSOCIATION SUPERSTARS OF WRESTLING, INC. on June 7, 2003 at 3:00 p.m. at an event at the United Community Center in Milwaukee, WI.   P Ex 37.  Press Release for June 7, 2003 for WWA Superstars of Wrestling at United Community Center.   P. Ex. 2, Patterson Affidavit # 48.

58. On April 23, 2003 Patterson entered into a license agreement with Madacy, Inc to sell video tapes and DVDs using the mark SUPERSTARS OF WRESTLING.  The merchandise licensed in this agreement was sold at Best Buy, Coconut and other retail stores selling DVDs and videos throughout the United States and Canada.  P Ex 2, Patterson Aff #47.  P. Ex. 10 License Agreement World Wrestling Association Superstars of Wrestling and MADACY.

59. Patterson filed for registration of the mark WORLD WRESTLING ASSOCIATION UNDER SERIAL NUMBER75/879939 with respect to entertainment services in the nature of wrestling matches, wrestling videotape production, and entertainment services in the nature of ongoing television programs featuring wrestling and promoting wrestling competitions of others".  The Patent and Trademark Office determined that there was a substantial likelihood of confusion between WORLD WRESTLING FEDERATION which was a registered mark at that

10

time and WORLD WRESTLING ASSOCIATION.  P Ex 2, Patterson Aff # 50.  P Ex 38.

60.  On Sept 30, 2004 a license agreement was entered into between Albert Patterson as licensor  and Mario Savoldi, as licensee, who was responsible for the production of the following videos and DVDs:

Classic Superstars of Wrestling; Superstars of Yesteryear.

Classic Superstars of Wrestling; Kings Queens & Superstars.

Superstars of Wrestling;: Steve Austin - The Early Years.

Classic Superstars of Wrestling: Shooting Stars of Today

Classic Superstars of Wrestling; Tag Team Tempest

Classic Superstars of Wrestling; The Wild, The Weird, The Wacky and The Woman.

Classic Superstars of Wrestling; Champions of the Squared Circle

Classic Superstars of Wrestling; Booker T. - The Early Years.

Classic Superstars of Wrestling; 8 DVD Set.

P Ex 39.

61.  Pursuant to the license agreement with Salvoldi, the SUPERSTARS OF WRESTLING DVDs were marketed on the internet on Amazon.com and E-bay throughout the United States and Canada and at live wrestling entertainment events.  P Ex 39, 40.

62.  A license agreement was entered into with Dale Gagne of Minneapolis, MN.  Gagne released and assigned all of his rights to AWA SUPERSTARS OF WRESTLING AND AWA SUPERSTARS to Patterson.  He agreed in the future to license Mr. Patterson's  marks  if he used those marks.   Plaintiff understands that Gagne has not again used Patterson's marks.  P Ex 41. P Ex 2, Patterson Affidavit # 50.

### TNA'S USE OF THE MARKS

63.  TNA is primarily a wrestling entertainment company that ran national pay per view

11

television programs out of Nashville each week.  TNA also taped one event for Fox Sports Net in Orlando, Florida.  P Ex 51, Romano dep p 6. lines 2-9.

64.  Frank Romano is the only TNA employee in New York. P Ex 51, Romano, dep p 9, lines 9-10.  TNA's operations are based in Nashville with about 8-10 employees.   P Ex 51, Romano dep p 4 line 24, p   Only one person located in Nashville reports to Romano.  P Ex 51, Romano dep p 5, lines 6-7.

65.  Frank Romano holds himself out to be the defendant's Chief Operating Officer, although he did not know who the officers of TNA are and he could not remember the name of TNA's President to whom he reports.  P Ex 51, Romano dep P 52.

66.  Frank Romano is the only TNA employee in New York. P Ex 51, Romano, dep p 9, lines 9-10.  TNA's operations are based in Nashville with about 8-10 employees.   P Ex 51, Romano dep p 4 line 24, p   Only one person located in Nashville reports to Romano.  P Ex 51, Romano dep p 5, lines 6-7.

67.  Although Romano signed the License Agreement and the affidavits with the title "Chief Operating Officer", Romano himself is not considered to be an officer of TNA.  P Ex 51, Romano dep, P 52.

68.  Although Romano averred that he made his affidavit based  "on his own personal knowledge", the only document Romano looked at in preparing the affidavit was the License Agreement attached as P Ex 52.   P Ex 51, Romano dep, p 43, line 10-18.

69.  Romano did not look at any documents in Tennessee or Texas in connection with preparing the affidavit.[1]  P Ex 51, Romano dep P 43-44.  Romano could not recall ever looking at royalty statements relating to the License Agreement and could not testify regarding the royalties

---

[1]  TNA is owned by Panda Energy Corporation, a publically traded corporation located  in Dallas, Texas.   Some TNA records are kept by TNA's parent corporation at its Dallas location. P Ex 51. Romano Dep pp 10, 23, 44.

12

received by TNA generated from Wisconsin subscribers.  This certainly indicates that Romano

had insufficient knowledge on the subject matter addressed in the affidavits.  Certainly, Romano

had no foundation to testify regarding the money received by TNA attributable to pay per view

sales to Wisconsin viewers.  Nor was he on site in Nashville where the TNA operations were

conducted.  Nor could he actually testify one way or the other regarding TNA's direct

connections with Wisconsin.

70.  Rather than running TNA's operations as his title implies, Romano's primary role

for TNA was as an assistant negotiator for TNA's agreements relating to distribution for pay per

view television.  P Ex 51, Romano dep, p 11, lines 11-19.

71.  Romano was not the chief negotiator for such contracts.  P Ex 51, Romano dep p 15.

### THE LICENSEE AGREEMENT EXPRESSLY APPOINTS IN DEMAND AS TNA's EXCLUSIVE AGENT FOR  SALES THROUGHOUT THE UNITED STATES

72.  TNA's License Agreement with In Demand is attached as an Exhibit to this

memorandum under seal as P Ex 52.  Paragraph 1 of the License Agreement (P. Ex 52, attached

hereto)  provides in relevant part:

> 1.  Program: "Program" shall mean each of the following programs: a series of fifty-two (52) weekly wrestling events over a one year period entitled "NWA Weekly Wrestling Series: TNA (Total Non-stop Action)." In Demand's role was to get the  TNA program entitled  "NWA Weekly Wrestling Series: TNA (Total Non-stop Action on Pay Per View).

73.  The Amended License Agreement at paragraph 2 creates an exclusive agency

relationship between TNA, as Licensor, and In Demand, as Licensee.  Paragraph 2 provides in

relevant part:

> 2. (a)(i).  Licensor hereby grants to Licensee , with respect to each program, the exclusive rights and license under copyright to: (A) **act as Licensor's exclusive sales agent with respect to the Exhibition of such Program throughout the Territory** during the License Period therefor by means of Non-Standard Television on a Pay-Per View Basis,

without limitation as to such Exhibition of such Program thereof, and (B) negotiate and enter into agreements with respect to such Exhibition of such Program (in Licensee's own name and/or on behalf of Licensor).  (Emphasis supplied)

74.   Paragraph 20 of the License Agreement, which was deleted, provides in relevant

part:

> 20. ...The Minimum Guarantee may be reduced proportionally in the event that the addressable universe is not fully cleared based on the assumption that the total number of addressable subscribers equals approximately 50 million subscribers, i.e. those of Licensee, DirecTV, EchoStar, Cablevision, Bell Express Vu and Viewer's Choice Canada....

75.   Romano, who testified that he had responsibility for negotiating the Amended License Agreement, testified that  the TNA telecast process worked this way:  "Once the contact is signed, the way the contract is written, from my understanding we televise the events live from Nashville,  put it up on satellite, authorize IN Demand to pull it down. They in turn throw the signal back up to their cable systems, and the cable systems pull it back down and the consumer orders their event through the cable system."  P Ex 51, Romano dep, P 17 lines12-20.

76.   According to paragraph 20 of the License Agreement, when In Demand is acting as exclusive sales agent for TNA, it negotiates agreements with the "cable systems" such as those named at paragraph 20 including but not limited to DirecTV, EchoStar, and Cablevision.  These cable systems will then pull the signals back down to their customers in the 50 states.

77.   To the extent that Time Warner Cable broadcasts TNA's events on pay per view, it must have obtained the authority to broadcast the event through In Demand, the exclusive sales agent for TNA. P Ex 51, Romano dep P 18-19.

78.   In Demand obtained its authority to act as TNA's agent from the License Agreement.  P Ex 51, Romano dep P 19.   P Ex 52.

14

79. Romano' testified during his deposition that there is a clear understanding that IN Demand obtained its authority to act on TNA's behalf through the License Agreement, and that IN Demand was expected to negotiate contracts on behalf of TNA with the cable systems to telecast TNA's events to cable system subscribers. P Ex 51, Romano dep 17:13 to 19:14.

80. It is apparent that TNA licensed weekly programs to IN Demand and that IN Demand, as exclusive sales agent for TNA, in turn arranged for distribution to end user subscribers through cable companies such as DirecTV. The cable companies, such as DirecTV, arranged for subscriptions from home viewers. P Ex 53 is a sample agreement with a home subscriber with DirecTV

81. Moreover, the License Agreement is the only agreement between TNA and In Demand. P Ex 51, Romano dep 19, lines 15-25. To the extent IN Demand sold subscriptions to its subscribers, it did so on behalf of TNA as TNA's exclusive sales agent. Thus, not only is IN Demand acting as TNA's agent to other cable systems, to the extent In Demand is a cable system, IN Demand's sales activities for the program are on behalf of TNA as sales agent.

82. Moreover, the programs were not limited to one broadcast a week. Romano testified that in addition to the regular Wednesday night broadcast, the programs were rebroadcast an undisclosed number of times in the discretion of IN Demand. P Ex 51, Romano dep p 21 lines 13-25.

83. As the exclusive sales agent of TNA, In Demand enters into contractual arrangements with the cable systems on TNA's behalf. Amended License Agreement, P Ex 52, paragraph 2.

84. Moreover, to the extent the Licensee agreement granted rights to IN Demand as a cable system, IN Demand, as the exclusive sales agent for TNA, solicited subscriptions directly

to In Demand's viewers on TNA's behalf.   P Ex 52, paragraph 2

85.  The License Agreement required TNA to furnish the ads and video spots to IN Demand to promote the program.  Exhibit C to the License Agreement is devoted to TNA's duties and responsibilities regarding the furnishing of advertising on IN Demand which will in turn furnish the advertisements to the cable systems.   Exhibit C uses the word "shall" with respect to the advertising obligations of TNA.

86.  According to the License Agreement, TNA developed the advertisements in the TV advertising spot at P Ex 54.

86.  As for the licensing activities, Romano has no foundation to testify regarding what the employees in Nashville did or what IN Demand did to promote the program pursuant to the licensing authority.   Romano did not look at any documents other than the License Agreement and his primary function as a TNA employee has been as a second chair negotiator for TNA's License Agreements.  P Ex 51, Romano dep, p 11, lines 11-19; p 15.

THE TELECASTS WERE THROUGHOUT THE UNITED STATES

87.  All TNA broadcasts and re-broadcasts were throughout the entire United States.  P Ex 51, Romano dep P 22 lines 8-10.

88.  The Territory is defined under the License Agreement in Section 1 at definition 12 as:

12.  Territory: The United States of America and its commonwealths, territories and possession (including without limitation, the U.S. Virgin Islands, Puerto Rico, Guam and Saipan), Canada, the Bahamas, Jamaica, the Cayman Islands, Curacao, the Netherlands Antilles (including, without limitation, St. Martin), and the West Indies.

89.  Romano testified that the programs are broadcast in all 50 states:

Q.  But were these programs telecast in all 50 states?

16

A.  To the best of my knowledge, yes.

P Ex 51, Romano dep P 21:4-6; 20: 1-3.


TNA PROVIDED THE ADVERTISING SLICKS AND SPOTS TO IN DEMAND

90.  With respect to advertising, the License Agreement (P Ex 52) provides at 5 (a)(i):

With respect to each Program, in connection with the rights granted to Licensee pursuant to Section 2 hereof, **Licensor shall deliver to Licensee**, not later than the Delivery Date therefor or as otherwise set forth on Exhibit C hereto, at no cost to Licensee, **the advertising and publicity material for such Program set forth on Exhibit C hereto**, together with all other advertising and promotional material requested by Licensee.   No advertising material delivered by or on behalf of Licensor with respect to a Program shall include and/or contain any reference to any program other than such Program, or any reference to the name and/or logo of Licensor or  any  party, without the prior written consent of Licensee.  (emphasis supplied)

P Ex 52

91.  Exhibit C to the License Agreement (P Ex B) provides with respect to advertising

provided by Licensor to Licensee:

Licensor **shall** deliver, at no cost to Licensee, the following advertising and promotional materials with respect to each version of each Program:

(i) **Camera ready customizable ad slicks in various sizes**;
(ii) Camera-ready logo artwork for program guides and billstuffers;
(iii) 35 mm color slides and black and white 8x10 stills'
(iv) Press kits including biographies of the performers, copylines, storylines, telemarketing scripts and on hold message;
 (v) **at least one new 30 second video spot** delivered each month during the Term hereof; and
(vi) radio spots, posters and premium items.  (emphasis supplied)
P Ex 52.

92.  Part 6 of the License Agreement (P Ex 52) provides in relevant part:

Licensor shall consult with Licensee regarding the content and preparation of the final version of each program.  Licensee shall not make any modifications, deletions, cuts or alterations in or to the final version of any Program without the prior approval of

17

Licensor....

93. The requirements of Part 6 of the License Agreement directly conflicts with

paragraph 13 of Romano's affidavit which states:

> 13. Pursuant to that license agreement, iN Demand exhibits, telecasts, uses markets and promotes the wrestling programs. TNA does not direct or control iN DEMAND'S marketing and promotional activities and iN DEMAND acts independently of those efforts.

94. The license agreement cannot be amended except in writing. P Ex 52 paragraph.

95. The License Agreement is the only agreement between TNA and IN Demand. P Ex

51, Romano dep 19, lines 15-25.

96. P Exhibit 54 is a video tape of an advertisement run countless numbers of times in

Wisconsin and throughout the United States by DirecTV for TNA's weekly wrestling events

which are the subject of this litigation. As provided in Exhibit C to the License agreement, it was

TNA's responsibility to deliver 30 second advertisement spots for the programs to In Demand.

In the advertisement in P Ex 51, Romano dep P Ex 3, Plaintiff's mark WORLD WRESTLING

SUPERSTARS is announced as presenting the TNA events. The advertisement contained in P

Ex 51, Romano dep Ex 3 was to promote a broadcast in Wisconsin on Wednesday night from 8-

10 for 52 weeks on a pay per view basis.

97. P Ex 49 is an advertisement by defendant or its agent In Demand using "World

Wrestling Superstars" on the IN Demand website.

98. The video advertisement is consistent with TNA's use of Patterson's mark in the

advertisements found at P Ex 49.

99. Romano testified that in addition to the regular Wednesday night broadcast, the

18

programs were rebroadcast an undisclosed number of times in the discretion of IN Demand.  P

Ex 51, Romano dep p 21 lines 13-25.

100.  All broadcasts and re-broadcasts were throughout the entire United States.  P Ex 51,

Romano dep P 22 lines 8-10.

101.  TNA on its website published as late as April, 2005 an advertisement using

WORLD WRESTLING SUPERSTARS .  P Ex 55

102.  TNA's use of a mark confusingly similar to plaintiff's marks in April of 2005 was

wilful and occurred after Plaintiff's response date to the defendant's Request to Admit.

A COMPETITOR DISCONTINUED USE OF WORLD WRESTLING FEDERATION

103.  Patterson filed for registration of the mark WORLD WRESTLING ASSOCIATION

UNDER SERIAL NUMBER75/879939 with respect to entertainment services in the nature of

wrestling matches, wrestling videotape production, and entertainment services in the nature of

ongoing television programs featuring wrestling and promoting wrestling competitions of

others".  The Patent and Trademark Office determined that there was a substantial likelihood of

confusion between WORLD WRESTLING FEDERATION which was registered mark at that

time and WORLD WRESTLING ASSOCIATION.  P Ex 2, Patterson Aff # 50.  P Ex 38.

104.  Patterson advised the United States Patent and Trademark Office of the pendency of

litigation involving the mark and his trademark application for WORLD WRESTLING

ASSOCIATION has been put on hold.  The findings with respect to Patterson's application for

registration under serial number 75/879939 have been put on hold pending the outcome of

litigation.

P Ex 2, Patterson Aff # 50   P. Ex 38.

105.  A competitor currently organized under the name World Wrestling Entertainment, Inc. was enjoined from using the initials WWF.   P Ex. 57,  Judgment.

106.  The evidence in that litigation revealed a secret license agreement between Titan Sports, Inc ( a predecessor name for the World Wrestling Entertainment, Inc) and the World Wildlife Fund to license the mark WWF.    P Ex. 57,  Judgment.

107.  The British Courts held that World Wrestling Entertainment, Inc. breached the license agreement and enjoined further use by World Wrestling Entertainment, Inc. of the initials WWF.  P Ex 57, Judgment.

108.  With respect to the litigation by and between defendant that the World Wildlife Fund, Inc the Court of Appeals confirmed the judgment and injunction rendered against the defendant finding in relevant part:

a.  The Titan Sports, Inc (now WWE) defendant and the World Wildlife Fund (Fund) entered into a contract which limited the defendants use of the initials WWF in its trade. P. Ex 1, Judgement paragraph 1.

b.  The Titan Sports, Inc (WWE)  admittedly broke the terms of the contract.  P. Ex 1, Judgment paragraph 1.

c.  Titan Sports was defendant's original name but adopted the name World Wrestling Federation Entertainment, Inc in 1999.  P. Ex 1, Judgment, Paragraph 4

d.  The initials WWF were introduced in 1983.  P. Ex 1, Judgment, Paragraph 7, 8

e.  The Titan Sports  filed for a registration of WWF in 1989 for the production of professional wrestling events rendered live and through the media of television.  The Fund opposed the registration on the basis of confusion.  P. Ex 1, Judgement paragraph 9.

f.  Titan Sports began asserting rights to the Funds WWF marks  in Denmark and Spain. The court noted that this seemed to be an admission that the marks were confusingly similar.  P. Ex 1, Judgment, Paragraph 16.

g.  With respect to the WWF Magazine relating to wrestling entertainment, Judge Rahm held that there was a risk of indirect confusion.  P. Ex 1, Judgment paragraph 18.

h.  The principal terms of the agreement between the Fund and the defendants are set out in paragraph 21.

i.  The Judgment states that the defendant simply ignored the contract beginning in 1997 and also adopted a scratch logo.   P. Ex 1 Judgment

j.  The court upheld the lower court's order and dismissed defendant's appeal. P. Ex 1 Judgment paragraph 72.

109.  The Judgment rejected the former WWF's arguments that the scratch logo did not cause confusion.  ""That meant if the Federation wanted to develop a worldwide trade, whether through the internet or any other means, the letters WWF were a very risky base on which to build it.  When it established its website, it was, or should have been, fully aware of that fact. The costs of "rebranding" now, after some five years of development, are entirely attributable to its own decision to take that risk.  The Scratch Logo may be less significant in itself, but it was part of the same strategy.  It was likewise a clear breach of the agreement, and the risks were apparent.".  P Exhibit 1 Judgment,  paragraph 71, Trademark Opposition Number 91153830.

110.  Following the decision of the Court of Appeals, on June 14, 2002 World Wrestling Federation Entertainment, Inc changed its name to World Wrestling Entertainment, Inc.  See P Exhibit 16, Certified copy of Delaware Secretary of State dated September 17, 2002.

111.  World Wrestling Entertainment, Inc announced that it would discontinue use of World Wrestling Federation.  P Ex 59, Press Release, and P Ex 60, World Wrestling Entertainment Annual Report to Shareholders for the year ended April 2002, under Legal Proceedings.

112.   The Annual Report for World Wrestling Entertainment, Inc. States at Part I Item

Business:

> World Wrestling Entertainment, Inc formerly known as World Wrestling Entertainment, Inc., was incorporated in Delaware in 1987, and in 1988 we merged with our predecessor company, which had existed since 1980. In October 1999, we sold 11, 500,000 shares of Class A common stock to the public at an initial offering price of $17.00 per share.

P Ex 60

113. The Defendant further stated in its Annual Report to Shareholders for the year

ended April 30, 2002 at Item 3. Legal Proceedings:

> In April 2000, the WWF–World Wide Fund for Nature (the "Fund") instituted legal proceedings against us in the English High Court seeking injunctive relief and unspecified damages for alleged breaches of an agreement between the Fund and us. The Fund alleges that our use of the initials "WWF" in various contexts, including (I) the wwf.com and wwfhsopzone.com internet domain names and in the contents of various of the our [sic] websites; and (ii) our "scratch logo violate the agreement between the Fund and us. In January 2001, the Fund filed for summary judgment on its claims. On August 10, 2001 the trial judge granted the Fund's motion for summary judgment, holding we breached the parties' 1994 agreement by using the "wwf" website addresses and scratch logo and that a trial is not warranted on these issues. **On October 1, 2001, the judge issued a form of written injunction barring most uses of the initials "WWF", including is connection with the 'wwf' website addresses and the use of the scratch logo, by us and our licensees**. On February 27, 2002, the Court of Appeal affirmed the trial judge's decision and dismissed our appeal; and on June 10, 2002, the House of Lords declined to hear our appeal. We have five months from the date of the House of Lords' decision to comply with the injunction. We intend to comply with the injunction and seek modification of the modification of the injunction where it is impractical and/or impossible to comply. Prior to the House of Lords' decision, we took steps to change our name to "World Wrestling Entertainment, Inc." and to revise our logo and switch our initials to "WWE". These changes have been incorporated into our television and pay-per-view shows, promotional materials used by us and our various distributors, affiliates and licensees, advertising campaigns as well as our corporate stationary and facilities and statutory filings with federal and state agencies. However, certain aspects of the injunction as issued may be impracticable to comply with and unless modified or clarified, may adversely affect the use or repackaging of our historical video library containing our former logo and verbal references to the "WWF" and our licensing program that uses our former logo on a variety of retail products, including toys and video games. The Fund also has pending before the trial court a damages claim associated with our use of the initials "WWF". (emphasis supplied)

P Ex 60.

114. The WWE stated its intention to abandon use of the words WORLD WRESTLING FEDERATION to the extent it had rights to that term. P Ex 59. Press release.

115. When Defendant submitted its Requests to Admit to Patterson in the above styled litigation on or about February 11, 2005, he reviewed them and at the time had no information upon which he could base a denial of those requests to admit. Exhibit 62, Patterson affidavit dated August 11, 2006.

116. Patterson first learned of Defendant TNA's use of advertisements using his registered trademark SUPERSTARS OF WRESTLING on or about April 13, 2006 when his attorney came across the advertisement when he was conducting research on the Internet. A copy of the Internet advertisement is attached hereto as Exhibit 62 . Patterson affidavit dated August 11, 2006

117. Defendant's televised events were advertised using the words SUPERSTARS OF WRESTLING for events scheduled to be broadcast on November 27, December 4, December 7, December 11, and December 18, 2002. P Exhibits 62, 63.

118. Defendant's televised events were advertised using the words SUPERSTARS OF TNA WRESTLING for an event premiering Aug. 14, 2005. P Exhibits 62, 64.

119. Defendant's televised events were advertised using the words"SUPERSTARS OF TNA WRESTLING" for an event that premiered Sept 11, 2005. P Exhibits 62, 65.

120. Defendant's televised events were advertised using the words SUPERSTARS OF PROFESSIONAL WRESTLING for an event premiering June 19, 2005. P Exhibits 62. 66.

121. TNA entered into a contract with In Demand, a true and correct copy of which is

23

attached hereto as Exhibit 52.  Dep of Frank Romano Exhibit 51.

122.  TNA was the successor in interest to J. Sports & Entertainment, Inc. under a contract by and between J Sports & Entertainment, Inc and In Demand.  P Exhibit 51.

123.  TNA split the profits of the broadcasts with In Demand.  P Exhibits 51, 67, Deposition of Thomas O'Neil.

124.  TNA was served with a copy of the Complaint in this action during 2004 and had knowledge of Patterson's claims after it received a copy of the Complaint in this action.  See court record.

125.  TNA was served with a copy of the First Amended Complaint in this action  and had knowledge of Patterson's claims as alleged therein after it received a copy of the First Amended Complaint in this action.  See court record.

126.  Steve Campbell testified as follows:

Q.  Would TNA do – would In Demand do the synopsis?
A.  Yes, In Demand would do the synopsis.
Q.  Would they do the synopsis on all these types of ads that would appear on the internet?
A.  Yes, it would, of course after In Demand has reviewed the materials that TNA has supplied, by the writing and the drafting of the synopsis is the responsibility of In Demand. P. Ex 68, Campbell dep.  P 12 line 21 to  P 13 line 2.

127.  No one gave TNA permission to use SUPERSTARS OF WRESTLING in advertisements.  P Ex. 68, Campbell dep p 36 lines 13-15

128.  TNA and In Demand split the revenue received for broadcasts of the TNA events on In Demand.  P Exhibit 67, O'Neil dep p 46

129.  Mr. O'Neil, the in house accountant for TNA testified Regarding Exhibit 7 to the

24

O'Neil deposition as to the split of revenue between In Demand and TNA.  P Ex 67, P 42-46

130.  Mr, O'Neil testified as follows:
Q  On the last page there's a split between the TNA portion and In Demand portion. Do you see that?
A. Yes Sir.

Do you know how that split was determined or—

A Well referencing – knowing some formatting, this would be related to the headings from the first page and not necessarily related to any of this data on the second page Ex 67, O'Neil dep p 46.

131.  Patterson received a royalty payment of a lump sum amount of $5,000 under the license agreement with Madacy.  P Ex 10, License agreement with Madacy.  .

132.  Patterson received a royalty payment of a lump sum amount of $1,500 under the license agreement with Mario Salvoldi.  P. Ex. 40 License agreement with Salvoldi

133.  In a Yahoo search by Boutwell on September 9, 2006 using the initials TNA WWE, the search indicated there were about 2,880,000 hits.  P. Exhibit 70

134.  In a Yahoo search by Boutwell on September 9, 2006 using the initials AFL NFL the search indicated there were about 4,850,0002 hits.  P. Exhibit 70

135.   Patterson filed a Motion for a Rule to Show Cause against Dale Gagner for using his service mark SUPERSTARS OF WRESTLING in the Eastern District of Wisconsin, Case Number 00-C-951.  P. Ex 74.

136.  TNA was served with a copy of the Complaint in this action during 2004 and had knowledge of Patterson's claims after it received a copy of the Complaint in this action.  See court record.   TNA was also served with a copy of the First Amended Complaint in this action  and had knowledge of Patterson's claims as alleged therein after it received a copy of the First Amended

Complaint in this action.  See court record.

137.  Patterson produced a live professional wrestling entertainment show in or about June or July, 2006 using WORLD WRESTLING ASSOCIATION SUPERSTARS OF WRESTLING service marks at the Old Palmer Theatre in Milwaukee, WI.  Approximately 150 people were in attendance.  P Ex. 72, Patterson affidavit dated September 11, 2006.

138.  An injunction issued against World Wrestling All-Stars, Inc  in favor of Albert Patterson in Case No 02 C 0240 In the Eastern District of Wisconsin dated September 1, 2005 barring World Wrestling All-Stars, Inc. from using WORLD WRESTLING ASSOCIATION, WWA, SUPERSTAR WRESTLING, SUPERSTARS WRESTLING, SUPERSTARS OF WRESTLING, SUPERSTARS OF PRO WRESTLING, WWA SUPERSTAR WRESTLING, WWA SUPERSTARS WRESTLING , WWA SUPERSTARS OF WRESTLING and WWA SUPERSTARS.  P Ex 73.

ALBERT PATTERSON

_____
Charles Drake Boutwell, His attorney

Charles Drake Boutwell
3075 Plum Island Drive
Northbrook, Il 60062
847-272-2126

CERTIFICATE OF SERVICE

I , Charles Drake Boutwell, hereby certify that I caused to by served a copy of
PLAINTIFF'S STATEMENT OF FACTS IN OPPOSITION TO DEFENDANT TNA'S
MOTION FOR SUMMARY JUDGMENT consisting of five volumes on Jenifer A. Puplava
MIKA MEYERS BECKETT & JONES, PLC, 900 Monroe Ave., Grand Rapids, MI 49503,
counsel for TNA, on September 11, 2006 via electronic transmission.


_____
Charles Drake Boutwell

Case 2:04-cv-00192-WEC   Filed 09/11/06   Page 27 of 27   Document 127-3