UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ALBERT PATTERSON, d/b/a WORLD
WRESTLING ASSOCIATION, d/b/a
SUPERSTARS OF WRESTLING, INC.
and d/b/a W.W.A. SUPERSTARS,

                Plaintiff,

    vs.

TNA ENTERTAINMENT, LLC,

                Defendant.

Case No. 04-C-0192

Magistrate Judge
William E. Callahan

---

### DEFENDANT TNA'S RESPONSE TO PLAINTIFF'S
### STATEMENT OF FACTS IN OPPOSITION TO
### DEFENDANT TNA'S MOTION FOR SUMMARY JUDGMENT

---

1.    Plaintiff registered the mark SUPERSTARS OF WRESTLING SW and SUPERSTARS OF WRESTLING with the United States Department of Commerce, Patent and Trademark Office under Registration Number 1857015 on October 4, 1994. A copy of the Notice of Acceptance of Registration under 15 U.S.C. 1058(a)(1) from the United States Department of Commerce Office of Patents and trademarks dated April 20, 2000 is attached as Exhibit F to the Complaint. The mark SUPERSTARS OF WRESTLING is for entertainment services in the nature of televison programs featuring wrestling. P. Exhibit 1.

**RESPONSE:** TNA disputes Plaintiff's statement that he received a principal registration of the tradename SUPERSTARS OF WRESTLING for wrestling entertainment services from the United States Patent and Trademark Office ("USPTO"). Plaintiff obtained a principal registration of the following composite mark consisting of words and design from the USPTO:



(*See* Certificate of Registration, Pl.'s Ex. 1.) Plaintiff does not have a registration for just the tradename SUPERSTARS OF WRESTLING without design. TNA admits that the Certificate of Registration at Plaintiff's Exhibit 1 shows that the composite mark was registered in connection with "entertainment services in the nature of television programs featuring wrestling, in class 41." (*Id.*)

2.     On March 30, 2000 World Wrestling Federation Entertainment, Inc.'s registration of the mark WWF SUPERSTARS under IC 41 with respect to entertainment services, namely television program featuring wrestling exhibitions and other related entertainment and the live performances by professional wrestlers/entertainers under registration number 1,819,240 was cancelled on the petition of Albert Patterson with the finding by Lynne G. Beresford, Deputy Commissioner for Trademark Policy in relevant part that,

> "Whereas it appears from the records of this office that the petitioner (*Patterson*) is the owner of trademark registration 1819240 and has complied with the provisions of Section 7(e) of the Trademark Act of 1946 and the Examiner of Trademarks has recommended the cancellation thereof.

P Exs 3 & 4.

**RESPONSE:** TNA denies that Plaintiff's Exhibit 4 supports the statement that World Wrestling Federation Entertainment, Inc. was the owner of Registration No. 1819240, as Plaintiff's Exhibit 4 indicates that the owner of such registration was Titan Sports, Inc. TNA further denies that Registration No. 1819240 was cancelled on the Petition of Albert Patterson, as Plaintiff's Exhibit 4 states that "Titan Sports, Inc. has surrendered Trademark Registration No. 1819240 for cancellation." TNA admits that Registration No. 1819240 for WWF SUPERSTARS was cancelled pursuant to the surrender of Titan Sports, Inc.

3.     Patterson became involved with the wrestling entertainment business with Justi Fontaine in Milwaukee in 1969. When Justi Fontaine died in 1974, Patterson took over the

business because the family didn't want the wrestling work. P Ex 2, Patterson Affidavit #1. In 1979, Patterson first used the tradename SUPERSTARS OF WRESTLING in connection with his wrestling entertainment events. P Ex 2, Patterson Affidavit # 1, 3.

**RESPONSE:** For purposes of TNA's Motion for Summary Judgment only, this statement is not disputed.

4.      From 1978 through 1985, Patterson principally presented his productions through the tradenames United Wrestling Association and SUPERSTARS OF WRESTLING. P Ex 2, Patterson Affidavit # 4. P Ex 11.

**RESPONSE:** For purposes of TNA's Motion for Summary Judgment only, this statement is not disputed.

5.      The marks SUPERSTAR WRESTLING, SUPERSTARS OF PRO WRESTLING, SUPERSTARS OF WRESTLING were first used by Mr. Patterson in commerce in 1979.

**RESPONSE:** For purposes of TNA's Motion for Summary Judgment only, this statement is not disputed.

6.      Plaintiffs Exhibit 11 includes United Wrestling Association posters and advertisements of events Patterson produced. These events were presented under the tradenames SUPERSTARS OF WRESTLING, SUPERSTAR WRESTLING AND SUPERSTARS OF PRO WRESTLING. P Ex 2, Patterson Affidavit #5.

**RESPONSE:** For purposes of TNA's Motion for Summary Judgment only, this statement is not disputed.

7.      In 1983 the United Wrestling Association using SUPERSTARS OF WRESTLING first broadcast wrestling entertainment on Channel 24 in Milwaukee. P Ex 2, Patterson Affidavit # 7.

**RESPONSE:** For purposes of TNA's Motion for Summary Judgment only, this statement is not disputed.

8.     After United Wrestling Association went bankrupt on October 31, 1985, Patterson continued to promote wrestling entertainment events under SUPERSTARS OF WRESTLING.  P Ex 2, Patterson Affidavit # 13.

**RESPONSE:** For purposes of TNA's Motion for Summary Judgment only, this statement is not disputed.

9.     Albert Patterson purchased all of the assets of United Wrestling Association on or about December 7, 1992 for $9,500.  In purchasing the assets of United Wrestling Association, Patterson also purchased the tradenames used by United Wrestling Association including but not limited to SUPERSTARS OF WRESTLING, SUPERSTARS WRESTLING and SUPERSTARS OF PRO WRESTLING.  P Ex 15, bill of sale from UWA to Albert Patterson dated Dec 7, 1992.

**RESPONSE:** For purposes of TNA's Motion for Summary Judgment only, this statement is not disputed.

10.     The court order in the litigation between Titan Sports, Inc and Albert Patterson reflects that defendant settled with Louis Jones as Trustee for the WORLD WRESTLING ASSOCIATION d//b/a as successor in interest to the United Wrestling Association.  P Ex 16, Court Order enjoining Titan Sports from using SUPERSTARS OF WRESTLING, SUPERSTARS OF PRO WRESTLING AND SUPERSTAR WRESTLING pursuant to a settlement with the WORLD WRESTLING ASSOCIATION, INC.

**RESPONSE:** TNA admits that the accepted Amended Offer of Judgment at Plaintiff's Exhibit 16 precludes Titan Sports, Inc. from using the phrases SUPERSTARS OF WRESTLING, SUPERSTAR WRESTLING and SUPERSTARS OF PRO WRESTLING in connection with wrestling activities.  This Amended Offer of Judgment also states that "This

offer of judgment does not preclude any party from using the term "Superstars." (*See also* the Opinion dated January 22, 1993 attached as Exhibit G to TNA Entertainment's Brief in Support of Motion for Summary Judgment.)

11. King Kong Enterprises, a company owned by Patterson, started using the tradename WORLD WRESTLING ASSOCIATION and WWA. P Ex 2, Patterson Affidavit #14. This tradename had been used since 1978 in magazines published by Patterson and sold at events. P Ex 12

**RESPONSE:** For purposes of TNA's Motion for Summary Judgment only, this statement is not disputed, except TNA disputes the statement in that the referenced exhibit does not appear to show use of the name after 1990.

12. In 1987 videos and magazines relating to Patterson's shows were registered under television programs filed with the Library of Congress in 1987. P Ex 2, Patterson Affidavit # 15.

**RESPONSE:** TNA admits that Patterson claims in his Affidavit that in 1987 videos and magazines relating to his shows were registered under television programs filed with the Library of Congress in 1987. Because Plaintiff's citation to the record did not include a citation to the registrations themselves, TNA has no knowledge regarding the content of such television programs or such alleged registrations.

13. Plaintiff first incorporated WORLD WRESTLING ASSOC. (W.W.A.) INC. in the State of Wisconsin on June 24, 1988. The name of WORLD WRESTLING ASSOC, (W.W.A.) INC. was changed to WORLD WRESTLING ASSOCIATION SUPERSTARS OF WRESTLING, INC in 1993. P. Ex 13.

**RESPONSE:** TNA admits that Plaintiff first incorporated WORLD WRESTLING ASSOC. (W.W.A) INC. in the State of Wisconsin on June 24, 1988. Plaintiff's Exhibit 13 does not support Plaintiff's contention that the name of WORLD WRESTLING ASSOC, (W.W.A.)

INC. was changed to WORLD WRESTLING ASSOCIATION SUPERSTARS OF WRESTLING, INC in 1993, so this allegation is disputed.

14. King Kong Enterprises adopted WWA Superstars of Pro Wrestling on July 19, 1989. P Ex 14.

**RESPONSE:** Disputed. TNA admits that Plaintiff's Exhibit 14 is a certification that King Kong Enterprises adopted the trade name WORLD WRESTLING ASSOCIATION on July 19, 1989. Plaintiff's Exhibit 14 contains no documentation showing adoption of the name WWA Superstars of Pro Wrestling.

15. Beginning in 1989 the caps sold at events bore the mark WORLD WRESTLING ASSOC.TM "W.W.A. Superstars" TM. P Ex 2, Patterson Affidavit #17.

**RESPONSE:** TNA admits that Patterson claims in his Affidavit that "beginning in 1989 the caps sold at events bore the mark WORLD WRESTLING ASSOC.TM "W.W.A. Superstars" TM."

16. T-shirts and caps were generally sold at Patterson's live events. After 1989 until the present, the T-shirts bore the mark WORLD WRESTLING ASSOCIATION SUPERSTARS OF WRESTLING. P Ex 2, Patterson Affidavit # 18.

**RESPONSE:** TNA admits that Patterson claims T-shirts and caps were sold in his Affidavit but Patterson's Affidavit does not state the time period during which such T-shirts were sold.

17. Normally, T-shirts were sold for $10.00 a shirt. On occasion such T-shirts were distributed as promotional item for advertisers free to people purchasing tickets to the events. For example, Jesse Reed on occasion provided free T- shirts as an advertising promotion for his furniture store in Milwaukee, WI. P Ex. 2, Patterson Affidavit # 18.

**RESPONSE:** TNA admits that Patterson's Affidavit supports the statement made in paragraph 17.

18.     The first use of the marks WWA and WORLD WRESTLING ASSOCIATION on television was on June 6, 1992 when Patterson ran a wrestling entertainment television show beginning June 6, 1992 until December 1993 on Channels 55 on Warner Cable, channel 43, Waukeshaw, WI using the marks WWA and WORLD WRESTLING ASSOCIATION. The shows also appeared in Beloit WI and Rockford, Illinois metropolitan areas on Channel 49, Channel 26 in Madison and Appleton, WI on channel 26 and in Green Bay, WI on Channel. The tradenames SUPERSTARS OF WRESTLING and WWA SUPERSTARS appeared on all of these broadcasts. P Exs 17, 18, 19, 32; P Ex. 2, Patterson Affidavit # 20. P Ex 43 Program on DVD.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 18.

19.     The ring announcer Naboisek using the name David Starr announced the show as, "World Wrestling Association Superstars of Wrestling, Incorporated present WWA Superstars of Wrestling live." P Ex. 2, Patterson Affidavit # 20.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 19.

20.     In Aug 1992 WWA SUPERSTARS OF WRESTLING presented a live wrestling entertainment event at Afro Fest. The attendance was at least 1,500. P Ex. 2, Patterson Affidavit # 21.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 20.

21.     With respect to pay per view television, the first use of the marks WORLD WRESTLING ASSOCIATION and WWA was on June 5, 1992 in a program entitled WWA SUPERSTARS OF WRESTLING.  Ex. 2, Patterson Affidavit # 22.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 21.

22.     A series of press releases publicized the TV broadcasts during 1992 including a May 19, 1992 press release that World Wrestling Association was returning to the air; a July 17, 1992 Press Release by W.W.A. Wrestling announcing Superstars of Wrestling at Afro Fest August 1, 1992 and on Channel 49; a press release by the World Wrestling Association that superstars of Wrestling will air on Channel 43 and Channel 49 on October 31, 1992.  P Ex 17.

**RESPONSE:** TNA admits that Plaintiff's Exhibit 17 is a May 19, 1992 press release stating, in total: "ALBERT PATTERSON, PRESIDENT OF THE WORLD WRESTLING ASSOCIATION, ANNOUNCED TODAY THAT SUPERSTARS OF WRESTLING WILL RETURN TO THE AIRWAVES ON SATURDAY, JUNE 6, 1992 AT 8:30 A.M. WITH A RE-PLAY[sic] ON SUNDAY, JUNE 7, 1992 AT 1:00 A.M. ON WJJA TV 49.  PLEASE CALL OR WATCH TV 49 FOR FURTHER INFORMATION PERTAINING TO SUPERSTARS OF WRESTLING.  ALL RIGHTS RESERVED BY WORLD WRESTLING ASSOCIATION, INC. TNA disputes the remaining statements in paragraph 22, as Plaintiff's Exhibit 17 does not support such statements.

23.     Video Tapes were recorded and played on 6/6/92 and again on 5/10/93 on Channels 49 and 51 using the mark WWA Superstars.  P Ex 18, TV 49 re June 6 to August World Wrestling Association Broadcast; P Ex 19, Confirming broadcast on TV 43.

**RESPONSE:** TNA admits that Plaintiff's Exhibit 19 is an April 6, 1992 letter indicating that "A June 6 start would not be a problem.  At present, the show would probably run between 3

and 6 p.m. on Saturday, with a similar Sunday repeat." TNA also admits that Plaintiff's Exhibit 18 is a contract/confirmation between TV 49 and World Wrestling Association indicating that a half hour program would run at 8:30 a.m. from June 6 to August 28.

24. Patterson advertised a show at the Mecca Auditorium on May 1, 1993 using WWA SUPERSTARS OF WRESTLING. P. Ex 21.

**RESPONSE:** TNA disputes that Patterson advertised using the mark "WWA SUPER-STARS OF WRESTLING." TNA admits that Plaintiff advertised a show at the Mecca Auditorium on May 1, 1993 using the words "YOUR FAVORITE W.W.A. SUPERSTARS" and the following composite mark:

**SW**
SUPERSTARS OF WRESTLING

25. Patterson produced a live show in Waukesha, WI in February of 1993 at the Waukesha Expo Center using the tradenames W.W.A. SUPERSTARS OF WRESTLING and WWA SUPERSTARS with SW in the middle at the event. The show was taped for broadcast on television and pay per view. P Ex. 2, Patterson Affidavit # 24. Plaintiff's DVD Exs 43, 46.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 25.

26. The name of the show on TV was WWA SUPERSTARS OF WRESTLING, WORLD WRESTLING. P Ex. 2, Patterson Affidavit # 24. P Ex 43, 46.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 26.

27. Contracts for the February 1993 show were signed by the WORLD WRESTLING ASSOCIATION with major wrestling talents including Nailz, Hercules, the Killer Bees (Brian

Blair and Jim Brunzell), Cowboy Bob Orton and the Midgets. P Ex 23. P Ex. 2, Patterson Affidavit # 25.

**RESPONSE:** TNA does not dispute the statement in paragraph 27.

28.     In Aug 1993 WWA SUPERSTARS OF WRESTLING presented a live wrestling entertainment event at the African World Festival (Afro Fest). The attendance was at least 1,500. P Ex. 2, Patterson Affidavit # 26.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 28.

29.     Patterson produced a live wrestling entertainment show every day in Detroit, MI on August 6-8, 1993 at the Jubilee Festival. P Ex. 2, Patterson Affidavit # 27. P Ex 25. Poster for Jubilee Festival in Detroit August 6-8, 1993.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 29.

30.     The events over the three days in Detroit were taped live for broadcast on pay per view for Labor Day world wide. The mark "WORLD WRESTLING ASSOCIATION SUPERSTARS OF WRESTLING, INC. was used. Pay per view broadcasts were on the pay per view channels on national pay view in 1993 by Keystone (now Globcast). The cost to watch the show was $19.95 on pay per view. Ex 2 Patterson Affidavit # 28. P Ex 24.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 26.

31.     Mr. Patterson has also used and licensed the marks SUPERSTARS OF WRESTLING in Australia. P. Ex 26.

**RESPONSE:** TNA admits that Plaintiff's Exhibit 26 indicates that an application to register the mark SUPERSTARS OF WRESTLING was filed in Australia.

32. Patterson held a WWA SUPERSTARS OF WRESTLING press conference on on April 8, 1993.

**RESPONSE:** Plaintiff has failed to provide a record citation supporting this statement.

33. Patterson registered the mark SUPERSTARS OF WRESTLING SW AND DESIGN in class 041 on October 4, 1994 with Registration Number 1857015. P Ex 1.

**RESPONSE:** TNA disputes Plaintiff's statement that he received a principal registration of the tradename SUPERSTARS OF WRESTLING from the United States Patent and Trademark Office ("USPTO"). Plaintiff obtained a principal registration of the following composite mark consisting of words and design from the USPTO:



(*See* Certificate of Registration, Pl.'s Ex. 1.) Plaintiff does not have a registration for just the tradename SUPERSTARS OF WRESTLING without design. The Certificate of Registration at Plaintiff's Exhibit 1 shows that the composite mark was registered in connection with "entertainment services in the nature of television programs featuring wrestling, in class 41." (*Id.*)

34. In Aug 1994 Patterson presented a WWA SUPERSTARS OF WRESTLING event at Afro Fest with approximately 1,500 in attendance. P Ex. 2, Patterson Affidavit # 30.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 34.

35. In Aug 1995 Patterson presented a WWA SUPERSTARS OF WRESTLING event at Afro Fest with approximately 1,500 in attendance. P Ex. 2, Patterson Affidavit # 31.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 35. However, Patterson testified in his deposition that since 1994 he personally utilized his claimed marks only in connection with production of live wrestling events which have occurred only once a year in Milwaukee. (Patterson Dep., Ex. 2 at 12-13; Exhibit I to the 9/11/2006 Affidavit of Jennifer Puplava; Patterson Dep. at 157-159, 175-176, &183; Exhibit C to the 9/11/2006 Affidavit of Jennifer Puplava.)

36.     World Wrestling Association Superstars of Wrestling, Inc. performed at the Eagles Club in Milwaukee, WI in September of 1995.  P Ex. 2, Patterson Affidavit # 32.  P Ex 63.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 36. However, Patterson testified in his deposition that since 1994 he personally utilized his claimed marks only in connection with production of live wrestling events which have occurred only once a year in Milwaukee. (Patterson Dep., Ex. 2 at 12-13; Exhibit I to the 9/11/2006 Affidavit of Jennifer Puplava; Patterson Dep. at 157-159, 175-176, &183; Exhibit C to the 9/11/2006 Affidavit of Jennifer Puplava.)

37.     Patterson presented shows at the Eagles Auditorium Sept 17, 1995 and November 26 and Dec 3, 1995.  P Exs 27, 28   The show featured the mark WORLD WRESTLING ASSOCIATION SUPERSTARS OF WRESTLING, INC  P Ex. 2, Patterson Affidavit # 32.  P Exs 27, 28, 63.

**RESPONSE:** Disputed.  Plaintiff's Exhibit 27 uses the phrases "WORLD WRESTLING ASSOCIATION," "WWA SUPERSTARS" and a slightly different version of the following composite mark:



Plaintiff's Exhibit 28 uses the phrases: "SUPER STAR'S"[sic], "SUPER STAR," "WWA SUPER STAR'S", "SUPERSTARS OF WRESTLING," "WWA SUPER STAR WRESTLING" and a slightly different version of the following composite mark:



Moreover, Patterson testified in his deposition that since 1994 he personally utilized his claimed marks only in connection with production of live wrestling events which have occurred only once a year in Milwaukee. (Patterson Dep., Ex. 2 at 12-13; Exhibit I to the 9/11/2006 Affidavit of Jennifer Puplava; Patterson Dep. at 157-159, 175-176, &183; Exhibit C to the 9/11/2006 Affidavit of Jennifer Puplava.)

38.     In Aug 1996 Patterson presented a WWA SUPERSTARS OF WRESTLING event at Afro Fest with approximately 1,500 in attendance. P Ex. 2, Patterson Affidavit # 33. P Ex 29, June 12, 1996 letter Re Afro Fest.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 38.

39.     In Aug 1997 Patterson presented a WWA SUPERSTARS OF WRESTLING event at Afro Fest with approximately 1,500 in attendance. P Ex. 43, Patterson Affidavit # 34

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 39. However, Patterson testified in his deposition that since 1994 he personally utilized his claimed marks only in connection with production of live wrestling events which

have occurred only once a year in Milwaukee. (Patterson Dep., Ex. 2 at 12-13; Exhibit I to the 9/11/2006 Affidavit of Jennifer Puplava; Patterson Dep. at 157-159, 175-176, &183; Exhibit C to the 9/11/2006 Affidavit of Jennifer Puplava.)

40.     World Wrestling Association Superstars of Wrestling, Inc. performed at the Eagles Club in Milwaukee, WI in 1997. The show featured the mark WORLD WRESTLING ASSOCIATION SUPERSTARS OF WRESTLING, INC. P Ex. 2, Patterson Affidavit # 35. P Ex 36.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 40. However, Patterson testified in his deposition that since 1994 he personally utilized his claimed marks only in connection with production of live wrestling events which have occurred only once a year in Milwaukee. (Patterson Dep., Ex. 2 at 12-13; Exhibit I to the 9/11/2006 Affidavit of Jennifer Puplava; Patterson Dep. at 157-159, 175-176, &183; Exhibit C to the 9/11/2006 Affidavit of Jennifer Puplava.)

41.     In Aug 1998 Patterson presented a WWA SUPERSTARS OF WRESTLING event at Afro Fest with approximately 1,500 in attendance. P Ex. 2, Patterson Affidavit # 36.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 41. However, Patterson testified in his deposition that since 1994 he personally utilized his claimed marks only in connection with production of live wrestling events which have occurred only once a year in Milwaukee. (Patterson Dep., Ex. 2 at 12-13; Exhibit I to the 9/11/2006 Affidavit of Jennifer Puplava; Patterson Dep. at 157-159, 175-176, &183; Exhibit C to the 9/11/2006 Affidavit of Jennifer Puplava.)

42.     The Eagles Club show in 1998 was taped and broadcast on Channel 13 cable TV which ran throughout Central, WI. in 1998. P Ex 35 Eagle Club advertisement Sept 1998 World Wrestling Assoc. P Ex. 2, Patterson Affidavit # 37.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 41. However, Patterson testified in his deposition that since 1993, he has not televised any wrestling events, and has personally utilized his claimed marks only in connection with production of live wrestling events which, since 1994, have occurred only once a year in Milwaukee. (Patterson Dep., Ex. 2 at 12-13; Exhibit I to the 9/11/2006 Affidavit of Jennifer Puplava; Patterson Dep. at 157-159, 175-176, &183; Exhibit C to the 9/11/2006 Affidavit of Jennifer Puplava.)

43.     World Wrestling Association Superstars of Wrestling, Inc. performed at the Eagles Club in Milwaukee, WI. The show featured the mark WORLD WRESTLING ASSOCIATION SUPERSTARS OF WRESTLING, INC in 1998. P Ex 35, Sept 1998 ad for World Wrestling Assoc "WWA Superstar" TM at Eagles auditorium.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 43. However, Patterson testified in his deposition that since 1994 he personally utilized his claimed marks only in connection with production of live wrestling events which have occurred only once a year in Milwaukee. (Patterson Dep., Ex. 2 at 12-13; Exhibit I to the 9/11/2006 Affidavit of Jennifer Puplava; Patterson Dep. at 157-159, 175-176, &183; Exhibit C to the 9/11/2006 Affidavit of Jennifer Puplava.)

44.     On June 19, 1999 Patterson presented a WWA SUPERSTARS OF WRESTLING event at The June 19 Fest with approximately 2,500 in attendance. P Ex. 2, Patterson Affidavit # 38.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 44. However, Patterson testified in his deposition that since 1994 he personally utilized his claimed marks only in connection with production of live wrestling events which have occurred only once a year in Milwaukee. (Patterson Dep., Ex. 2 at 12-13; Exhibit I to the

9/11/2006 Affidavit of Jennifer Puplava; Patterson Dep. at 157-159, 175-176, &183; Exhibit C to the 9/11/2006 Affidavit of Jennifer Puplava.)

45.     On June 19, 2000 Patterson presented a WWA SUPERSTARS OF WRESTLING event at The June 19 Fest with approximately 2,500 in attendance.  P Ex. 2, Patterson Affidavit # 39.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 45.  However, Patterson testified in his deposition that since 1994 he personally utilized his claimed marks only in connection with production of live wrestling events which have occurred only once a year in Milwaukee.  (Patterson Dep., Ex. 2 at 12-13; Exhibit I to the 9/11/2006 Affidavit of Jennifer Puplava; Patterson Dep. at 157-159, 175-176, &183; Exhibit C to the 9/11/2006 Affidavit of Jennifer Puplava.)

46.     In 1999 and 2000 the World Wrestling Association Superstars of Wrestling did four co-performances with Rampage Wrestling.  The marks World Wrestling Association Superstars of Wrestling were used.  World Wrestling Association Superstar Jeff May entertained at some of the shows.  The banners on the ring said WWA Superstars of Wrestling.  P Ex. 2, Patterson Affidavit # 40.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 46.  However, Patterson testified in his deposition that since 1994 he personally utilized his claimed marks only in connection with production of live wrestling events which have occurred only once a year in Milwaukee.  (Patterson Dep., Ex. 2 at 12-13; Exhibit I to the 9/11/2006 Affidavit of Jennifer Puplava; Patterson Dep. at 157-159, 175-176, &183; Exhibit C to the 9/11/2006 Affidavit of Jennifer Puplava.)

47. In June of 2000 World Wrestling Association Superstars of Wrestling performed an event at the Puerto Rican Fair. After this, annual event were performed at the Puerto Rican Fair. through 2003. P Ex. 2, Patterson Affidavit # 41.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 47. However, Patterson testified in his deposition that since 1994 he personally utilized his claimed marks only in connection with production of live wrestling events which have occurred only once a year in Milwaukee. (Patterson Dep., Ex. 2 at 12-13; Exhibit I to the 9/11/2006 Affidavit of Jennifer Puplava; Patterson Dep. at 157-159, 175-176, &183; Exhibit C to the 9/11/2006 Affidavit of Jennifer Puplava.)

48. Resort Live, Inc, through a license granted by Patterson, used the marks SUPERSTARS OF WRESTLING in all 50 states of the United States and 25-50 countries. Resort Live also broadcast WORLD WRESTLING ASSOCIATION and WWA in connection with some of these events. Resort Live, Inc. broadcast its programs on pay per view TV. Specifically, the mark Superstars of Wrestling was used by Resort Live, Inc pursuant to a license from Albert Patterson in Green Bay, WI in August 2000; Oroville, CA in August 2000; Truloc, CA in August 2000; Wollongong, Australia July 2000; Brisbane, Australia July 2000; Sydney, Australia July 2000; Perth, Australia August 2000; Hobart, Australia August 2000; Adelaide, Australia August 2000; and Melborne, Australia August 2000. P Ex 2, Patterson Affidavit # 42. P Exs 6, 7, 8.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 48, but denies that the Affidavit states which of the live events were broadcast on television or how many were broadcast.

49. The mark SUPERSTARS OF WRESTLING was used in the shows. See also P Ex 8 Patterson d/b/a World Wrestling Association license to Resort Live to use the mark SUPERSTARS OF WRESTLING.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 49.

50. As authorized under the license agreement with Resort Live, Inc. a show featuring Dennis Rodman was aired using the marks WORLD WRESTLING ASSOCIATION, WWA AND SUPERSTARS OF WRESTLING, marks licensed by Patterson throughout the United States and in 25-50 countries throughout the world beginning December 26, 2000 at 8:30 p.m. The show was re-broadcast about 50 times throughout the United States over the next few months. P Ex. 2, Patterson Affidavit # 43; P Ex 6, 7 and 8. P Ex 80 Tape of the WWA event featuring Rodman.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 50.

51. Patterson registered the mark SUPERSTARS OF WRESTLING in Sydney, Australia on October 14, 2002 with trademark number 867300. P Ex 26.

**RESPONSE:** TNA admits that Plaintiff's Exhibit 26 indicates that an application to register the mark SUPERSTARS OF WRESTLING was filed in Australia, but denies that the exhibit shows the registration was accepted.

52. On June 19, 2001, World Wrestling Association Superstars of Wrestling, Inc. performed an event at the Martin Luther King Center in Milwaukee, WI on Martin Luther King Drive using the marks WORLD WRESTLING ASSOCIATION SUPERSTARS OF WRESTLING. T-Shirts bearing the marks SUPERSTARS OF WRESTLING WWA

SUPERSTARS were given away by Reed Furniture which was a sponsor of the event. Ex. 2, Patterson Affidavit # 44.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 52. However, Patterson testified in his deposition that since 1994 he personally utilized his claimed marks only in connection with production of live wrestling events which have occurred only once a year in Milwaukee. (Patterson Dep., Ex. 2 at 12-13; Exhibit I to the 9/11/2006 Affidavit of Jennifer Puplava; Patterson Dep. at 157-159, 175-176, &183; Exhibit C to the 9/11/2006 Affidavit of Jennifer Puplava.)

53.     Patterson filed an application to register WORLD WRESTLING ASSOCIATION with the United States Patent and Trademark Office. P Ex. 2, Patterson Affidavit # 51. P Ex 38.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 53. However, Plaintiff's Exhibit 38 is a Final Action denying registration of Plaintiff's mark due to a likelihood of confusion with two registrations for WORLD WRESTLING FEDERATION.

54.     The World Wrestling Association Superstars of Wrestling, SUPERSTARS OF WRESTLING performed a wrestling entertainment event at the Puerto Rican Fair on June 19, 2002. P Ex. 2, Patterson Affidavit # 45.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 54. However, Patterson testified in his deposition that since 1994 he personally utilized his claimed marks only in connection with production of live wrestling events which have occurred only once a year in Milwaukee. (Patterson Dep., Ex. 2 at 12-13; Exhibit I to the 9/11/2006 Affidavit of Jennifer Puplava; Patterson Dep. at 157-159, 175-176, &183; Exhibit C to the 9/11/2006 Affidavit of Jennifer Puplava.)

55.     Albert Patterson directly used the mark "WORLD WRESTLING ASSOCIATION SUPERSTARS OF WRESTLING, INC. on June 7, 2002 at 3:00 p.m. at an event at the United Community Center in Milwaukee, WI.  P Ex. 2, Patterson Affidavit # 46.  P Ex 31 Gospel Night June 7 (2002) wrestling.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 55.  However, Patterson testified in his deposition that since 1994 he personally utilized his claimed marks only in connection with production of live wrestling events which have occurred only once a year in Milwaukee.  (Patterson Dep., Ex. 2 at 12-13; Exhibit I to the 9/11/2006 Affidavit of Jennifer Puplava; Patterson Dep. at 157-159, 175-176, &183; Exhibit C to the 9/11/2006 Affidavit of Jennifer Puplava.)

56.     The World Wrestling Association Superstars of Wrestling, Co. performed a wrestling entertainment event at the Puerto Rican Fair on June 19, 2002.  Ex. 43, Patterson Affidavit # 45.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 56.  However, Patterson testified in his deposition that since 1994 he personally utilized his claimed marks only in connection with production of live wrestling events which have occurred only once a year in Milwaukee.  (Patterson Dep., Ex. 2 at 12-13; Exhibit I to the 9/11/2006 Affidavit of Jennifer Puplava; Patterson Dep. at 157-159, 175-176, &183; Exhibit C to the 9/11/2006 Affidavit of Jennifer Puplava.)

57.     Albert Patterson directly used the mark "WORLD WRESTLING ASSOCIATION SUPERSTARS OF WRESTLING, INC. on June 7, 2003 at 3:00 p.m. at an event at the United Community Center in Milwaukee, WI.  P Ex 37.  Press Release for June 7, 2003 for WWA Superstars of Wrestling at United Community Center.  P. Ex. 2, Patterson Affidavit # 48.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 57. However, Patterson testified in his deposition that since 1994 he personally utilized his claimed marks only in connection with production of live wrestling events which have occurred only once a year in Milwaukee. (Patterson Dep., Ex. 2 at 12-13; Exhibit I to the 9/11/2006 Affidavit of Jennifer Puplava; Patterson Dep. at 157-159, 175-176, &183; Exhibit C to the 9/11/2006 Affidavit of Jennifer Puplava.)

58. On April 23, 2003 Patterson entered into a license agreement with Madacy, Inc to sell video tapes and DVDs using the mark SUPERSTARS OF WRESTLING. The merchandise licensed in this agreement was sold at Best Buy, Coconut and other retail stores selling DVDs and videos throughout the United States and Canada. P Ex 2, Patterson Aff #47. P. Ex. 10 License Agreement World Wrestling Association Superstars of Wrestling and MADACY.

**RESPONSE:** TNA admits that Plaintiff's Affidavit supports the statement made in paragraph 58.

59. Patterson filed for registration of the mark WORLD WRESTLING ASSOCIATION under Serial Number 75/879939 with respect to entertainment services in the nature of wrestling matches, wrestling videotape production, and entertainment services in the nature of ongoing television programs featuring wrestling and promoting wrestling competitions of others". The Patent and Trademark Office determined that there was a substantial likelihood of confusion between WORLD WRESTLING FEDERATION which was a registered mark at that time and WORLD WRESTLING ASSOCIATION. P Ex 2, Patterson Aff # 50. P Ex 38.

**RESPONSE:** TNA admits that Patterson filed for registration of the mark WORLD WRESTLING ASSOCIATION UNDER Serial Number 75/879939 and that the Patent and Trademark Office determined that there was a substantial likelihood of confusion between WORLD WRESTLING FEDERATION which was a registered mark at that time and WORLD

WRESTLING ASSOCIATION. Neither Patterson Affidavit ¶ 50 nor Plaintiff's Exhibit 38 indicates whether the application was filed with respect to entertainment services "in the nature of wrestling matches, wrestling videotape production, and entertainment services in the nature of ongoing television programs featuring wrestling and promoting wrestling competitions of others."

60.     On Sept 30, 2004 a license agreement was entered into between Albert Patterson as licensor and Mario Savoldi, as licensee, who was responsible for the production of the following videos and DVDs:

> Classic Superstars of Wrestling; Superstars of Yesteryear.
> Classic Superstars of Wrestling; Kings Queens & Superstars.
> Superstars of Wrestling;: Steve Austin - The Early Years.
> Classic Superstars of Wrestling: Shooting Stars of Today
> Classic Superstars of Wrestling; Tag Team Tempest
> Classic Superstars of Wrestling; The Wild, The Weird, The Wacky and The Woman.
> Classic Superstars of Wrestling; Champions of the Squared Circle
> Classic Superstars of Wrestling; Booker T. - The Early Years.
> Classic Superstars of Wrestling; 8 DVD Set.

P Ex 39.

**RESPONSE:** Plaintiff's Exhibit 39 consists only of copies of the front of the DVDs identified in Plaintiff's statement.

61.     Pursuant to the license agreement with Salvoldi, the SUPERSTARS OF WRESTLING DVDs were marketed on the internet on Amazon.com and E-bay throughout the United States and Canada and at live wrestling entertainment events.  P Ex 39, 40.

**RESPONSE:** Plaintiff's Exhibits 39 and 40 do not support Plaintiff's statement regarding the marketing of these DVDs.  Plaintiff's Exhibit 39 consists only of copies of the front of the DVDs identified in Plaintiff's statement.   Plaintiff's Exhibit 40 is a Settlement Agreement between Plaintiff and Savoldi.

62.     A license agreement was entered into with Dale Gagne of Minneapolis, MN. Gagne released and assigned all of his rights to AWA SUPERSTARS OF WRESTLING AND AWA SUPERSTARS to Patterson.  He agreed in the future to license Mr. Patterson's marks if he used those marks. Plaintiff understands that Gagne has not again used Patterson's marks.  P Ex 41.  P Ex 2, Patterson Affidavit # 50.

**RESPONSE:** TNA admits that Patterson Affidavit ¶ 50 states: "Dale Gagner assigned all of his interest in AWA SUPERSTARS OF WRESTLING, INC. to me as a part of a settlement agreement.    Dage [sic] Gagner had incorporated AWA SUPERSTARS OF WRESTLING, INC. in Minnesota on Jan 12, 1999."  TNA further admits that Plaintiff entered into a settlement agreement with Dale Gagne in which Gagne agreed in the future to license Mr. Patterson's claimed marks if he used those marks.  Plaintiff's record citations do not support the remainder of Plaintiff's statement in ¶ 62.

## TNA'S USE OF THE MARKS

63.     TNA is primarily a wrestling entertainment company that ran national pay per view television programs out of Nashville each week.  TNA also taped one event for Fox Sports Net in Orlando, Florida.  P Ex 51, Romano dep p 6. lines 2-9.

**RESPONSE:** Admits.

64.     Frank Romano is the only TNA employee in New York.  P Ex 51, Romano, dep p 9, lines 9-10.  TNA's operations are based in Nashville with about 8-10 employees.  P Ex 51, Romano dep p 4 line 24, p  Only one person located in Nashville reports to Romano.  P Ex 51, Romano dep p 5, lines 6-7.

**RESPONSE:** Defendant TNA objects to this paragraph to the extent that Plaintiff is attempting to establish facts which are not relevant to Defendant TNA's Motion for Summary

Judgment, under the purported authority of Civil L.R. 56.2(b)(2) which restricts factual statements to those "relevant to the motion." Frank Romano is no longer employed by TNA.

65. Frank Romano holds himself out to be the defendant's Chief Operating Officer, although he did not know who the officers of TNA are and he could not remember the name of TNA's President to whom he reports. P Ex 51, Romano dep P 52.

**RESPONSE:** Defendant TNA objects to this paragraph to the extent that Plaintiff is attempting to establish facts which are not relevant to Defendant TNA's Motion for Summary Judgment, under the purported authority of Civil L.R. 56.2(b)(2) which restricts factual statements to those "relevant to the motion." Frank Romano is no longer employed by TNA.

66. Frank Romano is the only TNA employee in New York. P Ex 51, Romano, dep p 9, lines 9-10. TNA's operations are based in Nashville with about 8-10 employees. P Ex 51, Romano dep p 4 line 24, p Only one person located in Nashville reports to Romano. P Ex 51, Romano dep p 5, lines 6-7.

**RESPONSE:** Defendant TNA objects to this paragraph to the extent that Plaintiff is attempting to establish facts which are not relevant to Defendant TNA's Motion for Summary Judgment, under the purported authority of Civil L.R. 56.2(b)(2) which restricts factual statements to those "relevant to the motion." Frank Romano is no longer employed by TNA.

67. Although Romano signed the License Agreement and the affidavits with the title "Chief Operating Officer", Romano himself is not considered to be an officer of TNA. P Ex 51, Romano dep, P 52.

**RESPONSE:** Defendant TNA objects to this paragraph to the extent that Plaintiff is attempting to establish facts which are not relevant to Defendant TNA's Motion for Summary Judgment, under the purported authority of Civil L.R. 56.2(b)(2) which restricts factual statements to those "relevant to the motion." Frank Romano is no longer employed by TNA.

68.    Although Romano averred that he made his affidavit based "on his own personal knowledge", the only document Romano looked at in preparing the affidavit was the License Agreement attached as P Ex 52.  P Ex 51, Romano dep, p 43, line 10-18.

**RESPONSE:** Defendant TNA objects to this paragraph to the extent that Plaintiff is attempting to establish facts which are not relevant to Defendant TNA's Motion for Summary Judgment, under the purported authority of Civil L.R. 56.2(b)(2) which restricts factual statements to those "relevant to the motion."  TNA admits that Romano testified that in preparing for his deposition, which was limited to the issue of the court's personal jurisdiction over TNA, he only reviewed the License Agreement.  (Romano Dep. at 43; Pl.'s Ex. 51.)

69.    Romano did not look at any documents in Tennessee or Texas in connection with preparing the affidavit.[1]  P Ex 51, Romano dep P 43-44.  Romano could not recall ever looking at royalty statements relating to the License Agreement and could not testify regarding the royalties received by TNA generated from Wisconsin subscribers.  This certainly indicates that Romano had insufficient knowledge on the subject matter addressed in the affidavits.  Certainly, Romano had no foundation to testify regarding the money received by TNA attributable to pay per view sales to Wisconsin viewers.  Nor was he on site in Nashville where the TNA operations were conducted.  Nor could he actually testify one way or the other regarding TNA's direct connections with Wisconsin.

**RESPONSE:** Defendant TNA objects to this paragraph to the extent that Plaintiff is attempting to establish facts which are not relevant to Defendant TNA's Motion for Summary Judgment, under the purported authority of Civil L.R. 56.2(b)(2) which restricts factual statements to those "relevant to the motion."  Without waiving this objection, TNA does not

---

[1] TNA is owned by Panda Energy Corporation, a publicly traded corporation located in Dallas, Texas. Some TNA records are kept by TNA's parent corporation at its Dallas location.  P Ex 51. Romano Dep pp 10, 23, 44.  (Footnote in Plaintiff's Fact Statement.)

dispute that Romano testified that in preparing for his deposition, which was limited to the issue of the court's personal jurisdiction over TNA, he only reviewed the License Agreement. (Romano Dep. at 43-44; Pl.'s Ex. 51.)

70. Rather than running TNA's operations as his title implies, Romano's primary role for TNA was as an assistant negotiator for TNA's agreements relating to distribution for pay per view television. P Ex 51, Romano dep, p 11, lines 11-19.

**RESPONSE:** Defendant TNA objects to this paragraph to the extent that Plaintiff is attempting to establish facts which are not relevant to Defendant TNA's Motion for Summary Judgment, under the purported authority of Civil L.R. 56.2(b)(2) which restricts factual statements to those "relevant to the motion." Frank Romano is no longer employed by TNA.

71. Romano was not the chief negotiator for such contracts. P Ex 51, Romano dep p 15.

**RESPONSE:** Defendant TNA objects to this paragraph to the extent that Plaintiff is attempting to establish facts which are not relevant to Defendant TNA's Motion for Summary Judgment, under the purported authority of Civil L.R. 56.2(b)(2) which restricts factual statements to those "relevant to the motion." Frank Romano is no longer employed by TNA.

## THE LICENSEE AGREEMENT EXPRESSLY APPOINTS IN DEMAND AS TNA'S EXCLUSIVE AGENT FOR SALES THROUGHOUT THE UNITED STATES

72. TNA's License Agreement with In Demand is attached as an Exhibit to this memorandum under seal as P Ex 52. Paragraph 1 of the License Agreement (P. Ex 52, attached hereto) provides in relevant part:

> 1. Program: "Program" shall mean each of the following programs: a series of fifty-two (52) weekly wrestling events over a one year period entitled "NWA Weekly Wrestling Series: TNA (Total Non-stop Action)."

In Demand's role was to get the TNA program entitled "NWA Weekly Wrestling Series: TNA (Total Non-stop Action on Pay Per View).

**RESPONSE:** TNA does not dispute that Plaintiff accurately quotes paragraph 1 of the License Agreement, as amended. TNA also does not dispute that the License Agreement, as amended, provided that TNA would deliver the Program to iN DEMAND. (Pl.'s Ex. 52.)

73.    The Amended License Agreement at paragraph 2 creates an exclusive agency relationship between TNA, as Licensor, and In Demand, as Licensee. Paragraph 2 provides in relevant part:

> 2. (a)(i). Licensor hereby grants to Licensee , with respect to each program, the exclusive rights and license under copyright to: (A) **act as Licensor's exclusive sales agent with respect to the Exhibition of such Program throughout the Territory** during the License Period therefor by means of Non-Standard Television on a Pay-Per View Basis, without limitation as to such Exhibition of such Program thereof, and (B) negotiate and enter into agreements with respect to such Exhibition of such Program (in Licensee's own name and/or on behalf of Licensor). (Emphasis supplied)

**RESPONSE:** TNA disputes that iN DEMAND acted as agent for TNA under the iN DEMAND License Agreement. Paragraph 11(l) of the Standard Terms of the iN DEMAND License Agreement provides: "Licensor and Licensee are independent contractors with respect to each other. Nothing herein shall create any association, partnership, joint venture, fiduciary or agency relationship between them."

74.    Paragraph 20 of the License Agreement, which was deleted, provides in relevant

> 20. ...The Minimum Guarantee may be reduced proportionally in the event that the addressable universe is not fully cleared based on the assumption that the total number of addressable subscribers equals approximately 50 million subscribers, i.e. those of Licensee, DirecTV, EchoStar, Cablevision, Bell Express Vu and Viewer's Choice Canada....

**RESPONSE:** TNA does not dispute that paragraph 74 accurately quotes a portion of deleted paragraph 20 of the License Agreement, as amended.

75. Romano, who testified that he had responsibility for negotiating the Amended License Agreement, testified that the TNA telecast process worked this way: "Once the contact [sic] is signed, the way the contract is written, from my understanding we televise the events live from Nashville, put it up on satellite, authorize IN Demand to pull it down. They in turn throw the signal back up to their cable systems, and the cable systems pull it back down and the consumer orders their event through the cable system." P Ex 51, Romano dep, P 17 lines l2-20.

**RESPONSE:** TNA admits that Plaintiff has accurately quoted Frank Romano's testimony at page 17 of his deposition.

76. According to paragraph 20 of the License Agreement, when In Demand is acting as exclusive sales agent for TNA, it negotiates agreements with the "cable systems" such as those named at paragraph 20 including but not limited to DirecTV, EchoStar, and Cablevision. These cable systems will then pull the signals back down to their customers in the 50 states.

**RESPONSE:** TNA disputes Plaintiff's statement, because the language in paragraph 20 of the License Agreement, as amended, relating to DirecTV, EchoStar and Cablevision was deleted. TNA further disputes that Plaintiff has accurately characterized the language or effect of deleted paragraph 20. TNA also disputes that iN DEMAND acted as agent for TNA under the iN DEMAND License Agreement. Paragraph 11(l) of the Standard Terms of the iN DEMAND License Agreement provides: "Licensor and Licensee are independent contractors with respect to each other. Nothing herein shall create any association, partnership, joint venture, fiduciary or agency relationship between them."

77. To the extent that Time Warner Cable broadcasts TNA's events on pay per view, it must have obtained the authority to broadcast the event through In Demand, the exclusive sales agent for TNA. P Ex 51, Romano dep P 18-19.

**RESPONSE:** TNA does not dispute that Romano testified at pages 18-19 of his deposition that to the extent Time Warner Cable broadcast TNA's events, he assumed it would have had to get authority to do so from iN DEMAND. Romano did not testify that IN DEMAND was the exclusive sales agent for TNA. TNA disputes that iN DEMAND acted as agent for TNA under the iN DEMAND License Agreement. Paragraph 11(l) of the Standard Terms of the iN DEMAND License Agreement provides: "Licensor and Licensee are independent contractors with respect to each other. Nothing herein shall create any association, partnership, joint venture, fiduciary or agency relationship between them."

78. In Demand obtained its authority to act as TNA's agent from the License Agreement. P Ex 51, Romano dep P 19. P Ex 52.

**RESPONSE:** TNA disputes that iN DEMAND acted as agent for TNA under the iN DEMAND License Agreement. Paragraph 11(l) of the Standard Terms of the iN DEMAND License Agreement provides: "Licensor and Licensee are independent contractors with respect to each other. Nothing herein shall create any association, partnership, joint venture, fiduciary or agency relationship between them." Frank Romano did not testify that iN DEMAND was TNA's agent.

79. Romano'[sic] testified during his deposition that there is a clear understanding that IN Demand obtained its authority to act on TNA's behalf through the License Agreement, and that IN Demand was expected to negotiate contracts on behalf of TNA with the cable systems to telecast TNA's events to cable system subscribers. P Ex 51, Romano dep 17:13 to 19:14.

**RESPONSE:** TNA disputes that iN DEMAND acted as agent for TNA under the iN DEMAND License Agreement. Paragraph 11(l) of the Standard Terms of the iN DEMAND License Agreement provides: "Licensor and Licensee are independent contractors with respect to each other. Nothing herein shall create any association, partnership, joint venture, fiduciary or agency relationship between them." Frank Romano did not testify that iN DEMAND was TNA's agent. Romano testified that he was not involved in negotiations between iN DEMAND and cable systems. (Romano Dep. at 17-19.)

80.     It is apparent that TNA licensed weekly programs to IN Demand and that IN Demand, as exclusive sales agent for TNA, in turn arranged for distribution to end user subscribers through cable companies such as DirecTV. The cable companies, such as DirecTV, arranged for subscriptions from home viewers. P Ex 53 is a sample agreement with a home subscriber with DirecTV

**RESPONSE:** Plaintiff fails to provide a record citation supporting the statement in paragraph 80. TNA disputes that iN DEMAND acted as agent for TNA under the iN DEMAND License Agreement. Paragraph 11(l) of the Standard Terms of the iN DEMAND License Agreement provides: "Licensor and Licensee are independent contractors with respect to each other. Nothing herein shall create any association, partnership, joint venture, fiduciary or agency relationship between them." Romano testified that he was not involved in negotiations between iN DEMAND and cable systems. (Romano Dep. at 17-19.)

81.     Moreover, the License Agreement is the only agreement between TNA and In Demand. P Ex 51, Romano dep 19, lines 15-25. To the extent IN Demand sold subscriptions to its subscribers, it did so on behalf of TNA as TNA's exclusive sales agent. Thus, not only is IN Demand acting as TNA's agent to other cable systems, to the extent In Demand is a cable system, IN Demand's sales activities for the program are on behalf of TNA as sales agent.

**RESPONSE:** TNA disputes that the License Agreement (Plaintiff's Exhibit 52) is the only agreement between TNA and iN DEMAND. A more recent contract replacing the 2002 contract was entered into between the parties (Campbell Dep. at 16-17; Exhibit Q to 9/26/2006 Affidavit of Jennifer Puplava). TNA disputes that iN DEMAND acted as agent for TNA under the iN DEMAND License Agreement. Paragraph 11(l) of the Standard Terms of the iN DEMAND License Agreement provides: "Licensor and Licensee are independent contractors with respect to each other. Nothing herein shall create any association, partnership, joint venture, fiduciary or agency relationship between them." Frank Romano did not testify that iN DEMAND was TNA's agent. Romano testified that he was not involved in negotiations between iN DEMAND and cable systems. (Romano Dep. at 17-19.)

82.     Moreover, the programs were not limited to one broadcast a week. Romano testified that in addition to the regular Wednesday night broadcast, the programs were rebroadcast an undisclosed number of times in the discretion of IN Demand. P Ex 51, Romano dep p 21 lines 13-25.

**RESPONSE:** TNA admits that the programs were telecast weekly on pay-per-view, and that iN DEMAND set the schedule for rebroadcasts in their own discretion. (Romano Dep. at 21-22.)

83.     As the exclusive sales agent of TNA, In Demand enters into contractual arrangements with the cable systems on TNA's behalf. Amended License Agreement, P Ex 52, paragraph 2.

**RESPONSE:** TNA disputes that iN DEMAND acted as agent for TNA under the iN DEMAND License Agreement. Paragraph 11(l) of the Standard Terms of the iN DEMAND License Agreement provides: "Licensor and Licensee are independent contractors with respect to each other. Nothing herein shall create any association, partnership, joint venture, fiduciary or

agency relationship between them." Paragraph 2 of the Amended License Agreement does not state that as the exclusive sales agent of TNA, iN DEMAND enters into contractual arrangements with cable systems on TNA's behalf. (Pl.'s Ex. 52.)

84. Moreover, to the extent the Licensee agreement granted rights to IN Demand as a cable system, IN Demand, as the exclusive sales agent for TNA, solicited subscriptions directly to In Demand's viewers on TNA's behalf. P Ex 52, paragraph 2.

**RESPONSE:** Neither paragraph 2 to the License Agreement nor paragraph 2 to the Amended License Agreement provides that to the extent the Licensee agreement granted rights to iN DEMAND as a cable system, iN DEMAND, as the exclusive sales agent for TNA, solicited subscriptions directly to In Demand's viewers on TNA's behalf. TNA disputes that iN DEMAND acted as agent for TNA under the iN DEMAND License Agreement. Paragraph 11(l) of the Standard Terms of the iN DEMAND License Agreement provides: "Licensor and Licensee are independent contractors with respect to each other. Nothing herein shall create any association, partnership, joint venture, fiduciary or agency relationship between them."

85. The License Agreement required TNA to furnish the ads and video spots to IN Demand to promote the program. Exhibit C to the License Agreement is devoted to TNA's duties and responsibilities regarding the furnishing of advertising on IN Demand which will in turn furnish the advertisements to the cable systems. Exhibit C uses the word "shall" with respect to the advertising obligations of TNA.

**RESPONSE:** TNA does not dispute that Exhibit C required TNA deliver advertising and promotional material to iN DEMAND, but Exhibit C does not require iN DEMAND to furnish the advertisements to cable systems. (Pl.'s Ex. 52.) Moreover, advertisements were changed either by iN DEMAND or the cable systems. (Barton Dep. at 92-93; Ex. F to 9/1/2006 Affidavit of Jennifer Puplava.)

86.     According to the License Agreement, TNA developed the advertisements in the TV advertising spot at P Ex 54.

**RESPONSE:**   TNA disputes that the License Agreement supports the factual statement that TNA created the advertisements at Plaintiff's Exhibit 54.   TNA does not dispute that Plaintiff's Exhibit 54 was produced by TNA but Plaintiff has provided no evidence that Exhibit 54 was ever aired on television.

86. [sic]   As for the licensing activities, Romano has no foundation to testify regarding what the employees in Nashville did or what IN Demand did to promote the program pursuant to the licensing authority.   Romano did not look at any documents other than the License Agreement and his primary function as a TNA employee has been as a second chair negotiator for TNA's License Agreements.   P Ex 51, Romano dep, p 11, lines 11-19; p 15.

**RESPONSE:**   Defendant TNA objects to this paragraph to the extent that Plaintiff is attempting to establish facts which are not relevant to Defendant TNA's Motion for Summary Judgment, under the purported authority of Civil L.R. 56.2(b)(2) which restricts factual statements to those "relevant to the motion."   TNA has not relied on Romano's testimony to support its Motion for Summary Judgment.

## THE TELECASTS WERE THROUGHOUT THE UNITED STATES

87.     All TNA broadcasts and re-broadcasts were throughout the entire United States. P Ex 51, Romano dep P 22 lines 8-10.

**RESPONSE:** Admits.

88.     The Territory is defined under the License Agreement in Section 1 at definition 12 as:

> 12.   Territory: The United States of America and its commonwealths, territories and possession (including without limitation, the U.S. Virgin Islands, Puerto Rico, Guam and Saipan), Canada, the Bahamas, Jamaica, the Cayman Islands,

Curacao, the Netherlands Antilles (including, without limitation, St. Maarten), and the West Indies.

**RESPONSE:** TNA does not dispute that Plaintiff has accurately quoted from paragraph 12 of the License Agreement, as amended.

89.   Romano testified that the programs are broadcast in all 50 states:

Q.   But were these programs telecast in all 50 states?
A.   To the best of my knowledge, yes.

P Ex 51, Romano dep P 21:4-6; 20: 1-3.

**RESPONSE:** TNA admits that paragraph 89 accurately quotes Frank Romano's testimony at page 21 of his deposition.

## TNA PROVIDED THE ADVERTISING SLICKS AND SPOTS TO IN DEMAND

90.   With respect to advertising, the License Agreement (P Ex 52) provides at 5 (a)(i):

With respect to each Program, in connection with the rights granted to Licensee pursuant to Section 2 hereof, **Licensor shall deliver to Licensee**, not later than the Delivery Date therefor or as otherwise set forth on Exhibit C hereto, at no cost to Licensee, **the advertising and publicity material for such Program set forth on Exhibit C hereto**, together with all other advertising and promotional material requested by Licensee.  No advertising material delivered by or on behalf of Licensor with respect to a Program shall include and/or contain any reference to any program other than such Program, or any reference to the name and/or logo of Licensor or any party, without the prior written consent of Licensee. (emphasis supplied)

P Ex 52

**RESPONSE:** TNA does not dispute that the above statement accurately quotes section 5(a)(i) of the License Agreement, as amended, and that emphasis has been added to the original language.

91.   Exhibit C to the License Agreement (P Ex B) provides with respect to advertising provided by Licensor to Licensee:

Licensor **shall** deliver, at no cost to Licensee, the following advertising and promotional materials with respect to each version of each Program:

(i)     **Camera ready customizable ad slicks in various sizes;**
(ii)    Camera-ready logo artwork for program guides and billstuffers;
(iii)   35 mm color slides and black and white 8x10 stills'
(iv)   Press kits including biographies of the performers, copylines, storylines, telemarketing scripts and on hold message;
(v)    **at least one new, 30 second video spot** delivered each month during the Term hereof; and
(vi)   radio spots, posters and premium items. (emphasis supplied)

P Ex 52.

**RESPONSE:** TNA does not dispute that the above statement accurately quotes Exhibit C to the License Agreement, as amended, and that emphasis has been added to the original language. TNA does not dispute that Exhibit C required TNA deliver advertising and promotional material to iN DEMAND, but Exhibit C does not require iN DEMAND to furnish the advertisements to cable systems or that the advertisements be used without modification. (Pl.'s Ex. 52.) Moreover, advertisements were changed either by iN DEMAND or the cable systems. (Barton Dep.at 92-93; Ex. F to 9/1/2006 Affidavit of Jennifer Puplava.)

92.     Part 6 of the License Agreement (P Ex 52) provides in relevant part:

Licensor shall consult with Licensee regarding the content and preparation of the final version of each program. Licensee shall not make any modifications, deletions, cuts or alterations in or to the final version of any Program without the prior approval of Licensor....

**RESPONSE:** TNA does not dispute that the above statement accurately quotes a portion of part 6 to the License Agreement, as amended, and that emphasis has been added to the original language. The License Agreement also provides the following definition of "program": "1. Program: "Program" shall mean each of the following programs: a series of fifty-two (52)

weekly wrestling events over a one year period entitled "NWA Weekly Wrestling Series: TNA (Total Non-stop Action)." (Pl.'s Ex. 52.)

93.    The requirements of Part 6 of the License Agreement directly conflicts with paragraph 13 of Romano's affidavit which states:

> 13. Pursuant to that license agreement, iN Demand exhibits, telecasts, uses markets and promotes the wrestling programs. TNA does not direct or control iN DEMAND'S marketing and promotional activities and iN DEMAND acts independently of those efforts.

**RESPONSE:** TNA does not dispute that Romano's affidavit is accurately quoted, but denies the claim that it conflicts with the License Agreement. Part 6 of the Licensing Agreement relate to modifications to Programs, which are defined as follows: "1. Program: "Program" shall mean each of the following programs: a series of fifty-two (52) weekly wrestling events over a one year period entitled "NWA Weekly Wrestling Series: TNA (Total Non-stop Action)." (Pl.'s Ex. 52.) The cited language from Romano's affidavit relates to iN DEMAND's marketing and promotional activities, not to modification of the Programs themselves.

94.    The license agreement cannot be amended except in writing. P Ex 52 paragraph.

**RESPONSE:** TNA does not dispute that Section 11(i) provides that the License Agreement "may be changed or modified by an agreement in writing signed by Licensor and Licensee." (Pl.'s Ex. 52.)

95.    The License Agreement is the only agreement between TNA and IN Demand. P Ex 51, Romano dep 19, lines 15-25.

**RESPONSE:** Denied. *See* Response to ¶ 81. (Campbell Dep. at 16-17, Ex. Q to 9/26/2006 Affidavit of Jennifer Puplava.)

96.    P Exhibit 54 is a video tape of an advertisement run countless numbers of times in Wisconsin and throughout the United States by DirecTV for TNA's weekly wrestling events

which are the subject of this litigation. As provided in Exhibit C to the License agreement, it was TNA's responsibility to deliver 30 second advertisement spots for the programs to In Demand. In the advertisement in P Ex 51 [sic, 54], Romano dep P Ex 3, Plaintiff's mark WORLD WRESTLING SUPERSTARS is announced as presenting the TNA events. The advertisement contained in P Ex 51 [sic, 54], Romano dep Ex 3 was to promote a broadcast in Wisconsin on Wednesday night from 8-10 for 52 weeks on a pay per view basis.

**RESPONSE:** Disputed. The advertisement at Plaintiff's Exhibit 54 clearly indicates that TNA is the sponsor of the event and uses "TNA" or "Total Nonstop Action" 4 times in 30 seconds (once every 7.5 seconds).

97.     P Ex 49 is an advertisement by defendant or its agent In Demand using "World Wrestling Superstars" on the IN Demand website.

**RESPONSE:** TNA disputes that it created this advertisement, and Plaintiff does not provide record support for its claim that TNA created the advertisement.

98.     The video advertisement is consistent with TNA's use of Patterson's mark in the advertisements found at P Ex 49.

**RESPONSE:** TNA denies that Plaintiff's mark is used in the advertisements at Plaintiff's Exhibit 49. TNA further denies that use of the words "world wrestling superstars" and "your favorite wrestling superstars" in the advertisements at Plaintiff's Exhibit 49 are likely to cause confusion with any of Plaintiff's trademarks. (*See* TNA's Brief in Support of Motion for Summary Judgment.)

99.     Romano testified that in addition to the regular Wednesday night broadcast, the programs were rebroadcast an undisclosed number of times in the discretion of IN Demand. P Ex 51, Romano dep p 21 lines 13-25.

**RESPONSE:** TNA admits that the programs were telecast weekly on pay-per-view, and that iN DEMAND set the schedule for rebroadcasts in their own discretion. (Romano Dep. at 21-22; Pl.'s Ex. 51.)

100. All broadcasts and re-broadcasts were throughout the entire United States. P Ex 51, Romano dep P 22 lines 8-10.

**RESPONSE:** Admits.

101. TNA on its website published as late as April, 2005 an advertisement using WORLD WRESTLING SUPERSTARS. P Ex 55

**RESPONSE:** TNA disputes that Plaintiff's Exhibit 55 supports Plaintiff's statement that the advertisement at Plaintiff's Exhibit 55 was published by TNA on its website as late as April 2005, and denies that Plaintiff's Exhibit 55 was published on TNA's website, as the content of Exhibit 55 also promotes non-TNA events.

102. TNA's use of a mark confusingly similar to plaintiff's marks in April of 2005 was willful and occurred after Plaintiffs response date to the defendant's Request to Admit.

**RESPONSE:** TNA denies that it has used any mark confusingly similar to Plaintiff's alleged marks, and also denies any willful infringement. See TNA's Motion for Summary Judgment, Brief in Support of Motion for Summary Judgment, and Response to Plaintiff's Motion for Summary Judgment. TNA disputes that Plaintiff's Exhibit 55 supports Plaintiff's statement that the advertisement at Plaintiff's Exhibit 55 was published by TNA on its website as late as April 2005, and denies that Plaintiff's Exhibit 55 was published on TNA's website, as the content of Exhibit 55 also promotes non-TNA events.

**A COMPETITOR DISCONTINUED USE OF WORLD WRESTLING FEDERATION**

103. Patterson filed for registration of the mark WORLD WRESTLING ASSOCIATION UNDER SERIAL NUMBER [sic] 75/879939 with respect to entertainment

services in the nature of wrestling matches, wrestling videotape production, and entertainment services in the nature of ongoing television programs featuring wrestling and promoting wrestling competitions of others". The Patent and Trademark Office determined that there was a substantial likelihood of confusion between WORLD WRESTLING FEDERATION which was registered mark at that time and WORLD WRESTLING ASSOCIATION. P Ex 2, Patterson Aff # 50. P Ex 38.

**RESPONSE:** TNA admits that Patterson filed for registration of the mark WORLD WRESTLING ASSOCIATION under serial number 75/879939 and that the Patent and Trademark Office determined that there was a substantial likelihood of confusion between WORLD WRESTLING FEDERATION which was a registered mark at that time and WORLD WRESTLING ASSOCIATION. Neither Patterson Affidavit ¶ 50 nor Plaintiff's Exhibit 38 indicates whether the application was filed with respect to entertainment services in the nature of wrestling matches, wrestling videotape production, and entertainment services in the nature of ongoing television programs featuring wrestling and promoting wrestling competitions of others."

104.    Patterson advised the United States Patent and Trademark Office of the pendency of litigation involving the mark and his trademark application for WORLD WRESTLING ASSOCIATION has been put on hold. The findings with respect to Patterson's application for registration under serial number 75/879939 have been put on hold pending the outcome of litigation. P Ex 2, Patterson Aff # 50 P. Ex 38.

**RESPONSE:** TNA admits that Patterson Affidavit ¶ 50 supports the statement in paragraph 104. Patterson filed for registration of the mark WORLD WRESTLING ASSOCIATION UNDER Serial Number 75/879939 and the Patent and Trademark Office determined that there was a substantial likelihood of confusion between WORLD WRESTLING

FEDERATION which was a registered mark at that time and WORLD WRESTLING ASSOCIATION.

105. A competitor currently organized under the name World Wrestling Entertainment, Inc. was enjoined from using the initials WWF. P Ex. 57, Judgment.

**RESPONSE:** Defendant TNA objects to this paragraph to the extent that Plaintiff is attempting to establish facts which are not relevant to Defendant TNA's Motion for Summary Judgment, under the purported authority of Civil L.R. 56.2(b)(2) which restricts factual statements to those "relevant to the motion." Without waiving this objection, TNA does not dispute that Plaintiff's Exhibit 57 is a Judgment from the Royal Courts of Justice in England enforcing a contract among the World Wide Fund for Nature and the World Wildlife Fund Inc. and the World Wrestling Federation Entertainment Inc. limiting the Federation's freedom to use the initials WWF in its trade. This case had nothing to do with claimed confusion with Patterson's claimed World Wrestling Association or WWA marks.

106. The evidence in that litigation revealed a secret license agreement between Titan Sports, Inc (a predecessor name for the World Wrestling Entertainment, Inc) and the World Wildlife Fund to license the mark WWF. P Ex. 57, Judgment.

**RESPONSE:** Defendant TNA objects to this paragraph to the extent that Plaintiff is attempting to establish facts which are not relevant to Defendant TNA's Motion for Summary Judgment, under the purported authority of Civil L.R. 56.2(b)(2) which restricts factual statements to those "relevant to the motion." Without waiving this objection, TNA does not dispute that Plaintiff's Exhibit 57 discussed a License Agreement between World Wide Fund for Nature and Titan Sports, Inc.

107.    The British Courts held that World Wrestling Entertainment, Inc. breached the license agreement and enjoined further use by World Wrestling Entertainment, Inc. of the initials WWF.  P Ex 57, Judgment.

**RESPONSE:** The statement in this paragraph is not a factual proposition as contemplated by Civil L.R. 56.2(b)(2) and does not pertain to any facts relevant to Defendant TNA's Motion for Summary Judgment or the factual allegations in Plaintiff's Amended Complaint.   Further, said statement constitutes a legal conclusion or argument which is inappropriate for inclusion in a statement of facts under Civil L.R. 56.2(b)(2).

108.    With respect to the litigation by and between defendant that the World Wildlife Fund, Inc the Court of Appeals confirmed the judgment and injunction rendered against the defendant finding in relevant part:

a.    The Titan Sports, Inc (now WWE) defendant and the World Wildlife Fund (Fund) entered into a contract which limited the defendants use of the initials WWF in its trade. P. Ex 1, Judgment paragraph 1.

b.    The Titan Sports, Inc (WWE) admittedly broke the terms of the contract.  P. Ex 1, Judgment paragraph 1.

c.    Titan Sports was defendant's original name but adopted the name World Wrestling Federation Entertainment, Inc in 1999.  P. Ex 1, Judgment, Paragraph 4

d.    The initials WWF were introduced in 1983. P. Ex 1, Judgment, Paragraph 7, 8

e.    The Titan Sports filed for a registration of WWF in 1989 for the production of professional wrestling events rendered live and through the media of television.   The Fund opposed the registration on the basis of confusion.  P. Ex 1, Judgment  paragraph 9.

f.    Titan Sports began asserting rights to the Funds WWF marks in Denmark and Spain.  The court noted that this seemed to be an admission that the marks were confusingly similar.  P. Ex 1, Judgment, Paragraph 16.

g. With respect to the WWF Magazine relating to wrestling entertainment, Judge Rahm held that there was a risk of indirect confusion. P. Ex 1, Judgment paragraph 18.

h. The principal terms of the agreement between the Fund and the defendants are set out in paragraph 21.

i. The Judgment states that the defendant simply ignored the contract beginning in 1997 and also adopted a scratch logo. P. Ex 1 Judgment

j. The court upheld the lower court's order and dismissed defendant's appeal. P. Ex 1 Judgment paragraph 72.

**RESPONSE:** The statement in this paragraph is not a factual proposition as contemplated by Civil L.R. 56.2(b)(2) and does not pertain to any facts relevant to Defendant TNA's Motion for Summary Judgment or the factual allegations in Plaintiff's Amended Complaint. Further, said statement constitutes a legal conclusion or argument which is inappropriate for inclusion in a statement of facts under Civil L.R. 56.2(b)(2).

109. The Judgment rejected the former WWF's arguments that the scratch logo did not cause confusion. "That meant if the Federation wanted to develop a worldwide trade, whether through the Internet or any other means, the letters WWF were a very risky base on which to build it. When it established its website, it was, or should have been, fully aware of that fact. The costs of "rebranding" now, after some five years of development, are entirely attributable to its own decision to take that risk. The Scratch Logo may be less significant in itself, but it was part of the same strategy. It was likewise a clear breach of the agreement, and the risks were apparent". P Exhibit 1 Judgment, paragraph 71, Trademark Opposition Number 91153830.

**RESPONSE:** The statement in this paragraph is not a factual proposition as contemplated by Civil L.R. 56.2(b)(2) and does not pertain to any facts relevant to Defendant TNA's Motion for Summary Judgment or the factual allegations in Plaintiff's Amended

Complaint. Further, said statement constitutes a legal conclusion or argument which is inappropriate for inclusion in a statement of facts under Civil L.R. 56.2(b)(2).

110. Following the decision of the Court of Appeals, on June 14, 2002 World Wrestling Federation Entertainment, Inc changed its name to World Wrestling Entertainment, Inc. See P Exhibit 16, Certified copy of Delaware Secretary of State dated September 17, 2002.

**RESPONSE:** The statement contained in this paragraph is not relevant to Defendant TNA's Motion for Summary Judgment, which is based on the allegations in Plaintiff's Amended Complaint, and on the admissions of fact acknowledged by Plaintiff in response to the present Motion for Summary Judgment. Thus, the statement in this paragraph is not proper under Civil L.R. 56.2(b)(2).

111. World Wrestling Entertainment, Inc announced that it would discontinue use of World Wrestling Federation. P Ex 59, Press Release, and P Ex 60, World Wrestling Entertainment Annual Report to Shareholders for the year ended, April 2002, under Legal Proceedings.

**RESPONSE:** Defendant TNA objects to this paragraph to the extent that Plaintiff is attempting to establish facts which are not relevant to Defendant TNA's Motion for Summary Judgment, under the purported authority of Civil L.R. 56.2(b)(2) which restricts factual statements to those "relevant to the motion." Without waiving this objection, TNA does not dispute that the press release contains such an announcement.

112. The Annual Report for World Wrestling Entertainment, Inc. States at Part I Item Business:

> World Wrestling Entertainment, Inc formerly known as World Wrestling Entertainment, Inc., was incorporated in Delaware in 1987, and in 1988 we merged with our predecessor company, which had existed since 1980. In October 1999, we sold 11,500,000 shares of Class A common stock to the public at an initial offering price of $17.00 per share.

P Ex 60.

**RESPONSE:** Defendant TNA objects to this paragraph to the extent that Plaintiff is attempting to establish facts which are not relevant to Defendant TNA's Motion for Summary Judgment, under the purported authority of Civil L.R. 56.2(b)(2) which restricts factual statements to those "relevant to the motion." Without waiving this objection, TNA does not dispute the accuracy of this quotation.

113.    The Defendant further stated in its Annual Report to Shareholders for the year ended April 30, 2002 at Item 3. Legal Proceedings:

> In April 2000, the WWF–World Wide Fund for Nature (the "Fund") instituted legal proceedings against us in the English High Court seeking injunctive relief and unspecified damages for alleged breaches of an agreement between the Fund and us. The Fund alleges that our use of the initials "WWF" in various contexts, including (I) the wwf.com and wwfhsopzone.com internet domain names and in the contents of various of the our websites; and (ii) our "scratch logo violate the agreement between the Fund and us. In January 2001, the Fund filed for summary judgment on its claims. On August 10, 2001 the trial judge granted the Fund's motion for summary judgment, holding we breached the parties' 1994 agreement by using the "wwf" website addresses and scratch logo and that a trial is not warranted on these issues. **On October 1, 2001, the judge issued a form of written injunction barring most uses of the initials "WWF", including is connection with the `wwf' website addresses and the use of the scratch logo, by us and our licensees**. On February 27, 2002, the Court of Appeal affirmed the trial judge's decision and dismissed our appeal; and on June 10, 2002, the House of Lords declined to hear our appeal. We have five months from the date of the House of Lords' decision to comply with the injunction. We intend to comply with the injunction and seek modification of the modification of the injunction where it is impractical and/or impossible to comply. Prior to the House of Lords' decision, we took steps to change our name to "World Wrestling Entertainment, Inc." and to revise our logo and switch our initials to "WWE". These changes have been incorporated into our television and pay-per-view shows, promotional materials used by us and our various distributors, affiliates and licensees, advertising campaigns as well as our corporate stationary and facilities and statutory filings with federal and state agencies. However, certain aspects of the injunction as issued may be impracticable to comply with and

> unless modified or clarified, may adversely affect the use or repackaging of our historical video library containing our former logo and verbal references to the "WWF" and our licensing program that uses our former logo on a variety of retail products, including toys and video games. The Fund also has pending before the trial court a damages claim associated with our use of the initials "WWF". (emphasis supplied)

P Ex 60.

**RESPONSE:** Defendant TNA objects to this paragraph to the extent that Plaintiff is attempting to establish facts which are not relevant to Defendant TNA's Motion for Summary Judgment, under the purported authority of Civil L.R. 56.2(b)(2) which restricts factual statements to those "relevant to the motion." Without waiving this objection, TNA does not dispute the accuracy of this quotation.

114. The WWE stated its intention to abandon use of the words WORLD WRESTLING FEDERATION to the extent it had rights to that term. P Ex 59. Press release.

**RESPONSE:** Defendant TNA objects to this paragraph to the extent that Plaintiff is attempting to establish facts which are not relevant to Defendant TNA's Motion for Summary Judgment, under the purported authority of Civil L.R. 56.2(b)(2) which restricts factual statements to those "relevant to the motion." Without waiving this objection, TNA does not dispute that Plaintiff's Exhibit 59 is a press release in which World Wrestling Federation Entertainment announced it was changing its name to World Wrestling Entertainment.

115. When Defendant submitted its Requests to Admit to Patterson in the above styled litigation on or about February 11, 2005, he reviewed them and at the time had no information upon which he could base a denial of those requests to admit. Exhibit 62. Patterson affidavit dated August 11, 2006.

**RESPONSE:** TNA does not dispute that when it submitted its Requests to Admit to Plaintiff on or about February 11, 2005, Plaintiff reviewed them and at the time had no

information upon which he could base a denial of those requests to admit. TNA does dispute Plaintiff's claim that the advertisements he claims to have discovered after February 11, 2005 justify amendment of Plaintiff's Responses to Request to Admit. (*See* TNA's Response to Plaintiff's Motion for Leave to Amend His Responses to Defendant's Request to Admit Instanter.)

116.    Patterson first learned of Defendant TNA's use of advertisements using his registered trademark SUPERSTARS OF WRESTLING on or about April 13, 2006 when his attorney came across the advertisement when he was conducting research on the Internet.  A copy of the Internet advertisement is attached hereto as <u>Exhibit 62</u>.  Patterson affidavit dated August 11, 2006.

**RESPONSE:**  TNA disputes Plaintiff's claim that Plaintiff's Exhibit 62 (Exhibit 4) is TNA's ad, or was used by TNA in any way.  (Campbell Dep. at 15 & 24-25, Ex. D to 9/11/2006 Affidavit of Jennifer Puplava; Barton Dep. at 91-93 & 99, Ex. F to 9/11/2006 Affidavit of Jennifer Puplava).  TNA does not dispute that on or about April 13, 2006, Plaintiff's attorney discovered the 2002 advertisement created and published by Alameda Power & Telecom using the words SUPERSTARS OF WRESTLING (Pl.'s Ex. 4 to Ex. 62) but denies that Plaintiff and his counsel could not have discovered the 2002 advertisement much earlier by conducting the same internet search apparently performed in 2006.

117.    Defendant's televised events were advertised using the words SUPERSTARS OF WRESTLING for events scheduled to be broadcast on November 27, December 4, December 7, December 11, and December 18, 2002.  P Exhibits 62, 63.

**RESPONSE:**  TNA does not dispute that Plaintiff's Exhibits 62 (Exhibit 4) and 63 show that TNA's televised events were advertised by Alameda Power & Telecom using the words SUPERSTARS OF WRESTLING for events scheduled to be broadcast on November 27,

December 4, December 7, December 11 and December 18, 2002. TNA does dispute that TNA created or placed the text in the advertisement at Plaintiff's Exhibit 62 and 63. (Barton Dep. at 91-93 & 99, Ex. F to 9/11/2006 Affidavit of Jennifer Puplava.) There is no dispute that the advertisement using the words SUPERSTARS OF WRESTLING (Pl.'s Exs. 62 & 63) was created, published and copyrighted by "Alameda Power & Telecom, a Department of the City of Alameda," and that TNA has no relationship with the city of Alameda, California. (Campbell Dep. at 24-25.)

118. Defendant's televised events were advertised using the words SUPERSTARS OF TNA WRESTLING for an event premiering Aug. 14, 2005. P Exhibits 62, 63.

**RESPONSE:** Plaintiff's Exhibits 62 and 63 do not advertise an event premiering August 14, 2005. TNA does not dispute that Plaintiff's Exhibits 62 (Exhibit 4) and 63 show that TNA's televised events were advertised by Alameda Power & Telecom using the words SUPERSTARS OF WRESTLING for events scheduled to be broadcast on November 27, December 4, December 7, December 11 and December 18, 2002. TNA does dispute that TNA created or placed the text in the advertisement at Plaintiff's Exhibit 62 and 63. (Barton Dep. at 91-93 & 99, Ex. F to 9/11/2006 Affidavit of Jennifer Puplava.) There is no dispute that the advertisement using the words SUPERSTARS OF WRESTLING (Pl.'s Exs. 62 & 63) was created, published and copyrighted by "Alameda Power & Telecom, a Department of the City of Alameda," and that TNA has no relationship with the city of Alameda, California. (Campbell Dep. at 24-25.) TNA does not dispute that Plaintiff's Exhibit 64 shows that a TNA televised event on August 14, 2005 was advertised using the words "superstars of TNA Wrestling."

119. Defendant's televised events were advertised using the words "SUPERSTARS OF TNA WRESTLING" for an event that premiered Sept 11, 2005. P Exhibits 62, 65.

**RESPONSE:** TNA does not dispute that Plaintiff's Exhibit 65 shows that a TNA televised event on September 11, 2005 was advertised using the words "superstars of TNA Wrestling."

120. Defendant's televised events were advertised using the words SUPERSTARS OF PROFESSIONAL WRESTLING for an event premiering June 19, 2005. P Exhibits 62, 65.

**RESPONSE:** TNA disputes that Defendant's characterization of Exhibit 65, as the wording in the advertisement at Plaintiff's Exhibit 66 is instead ". . . they have risen . . conquered . . and emerged as the new superstars of professional wrestling."

121. TNA entered into a contract with In Demand, a true and correct copy of which is attached hereto as Exhibit 52. Dep of Frank Romano Exhibit 51.

**RESPONSE:** TNA does not dispute that it entered into a contract with iN DEMAND, or that the document attached by Plaintiff as Exhibit 52 is a marked up copy of the contract between TNA and iN DEMAND. TNA does dispute that the handwriting on the copy of the contract provided by Plaintiff was part of the original contract. TNA further disputes that the contract at Plaintiff's Exhibit 52 was the only contract between TNA and iN DEMAND. (Campbell Dep. at 16-17; *see* Response to ¶ 81.)

122. TNA was the successor in interest to J. Sports & Entertainment, Inc. under a contract by and between J Sports & Entertainment, Inc and In Demand. P Exhibit 51.

**RESPONSE:** TNA does not dispute that TNA was the successor in interest to J. Sports & Entertainment, Inc. under a contract by and between J. Sports & Entertainment, Inc. and iN DEMAND.

123. TNA split the profits of the broadcasts with In Demand. P Exhibits 51, 67, Deposition of Thomas O'Neil.

**RESPONSE:** TNA disputes that the broadcasts made any profit. (*See* Affidavit of Dean Broadhead, CFO of TNA Entertainment (filed under seal).) TNA does not dispute that TNA and iN DEMAND split the *revenue* received for the broadcast of TNA events on iN DEMAND.

124. TNA was served with a copy of the Complaint in this action during 2004 and had knowledge of Patterson's claims after it received a copy of the Complaint in this action. See court record.

**RESPONSE:** TNA disputes that it was served with a copy of the Complaint in this action in 2004 and had knowledge of Plaintiff's claims after it received a copy of the Complaint in this action. TNA was not named in, and was never served with, the original Complaint in this action. TNA was added as a party by, and was served with, the First Amended Complaint.

125. TNA was served with a copy of the First Amended Complaint in this action and had knowledge of Patterson's claims as alleged therein after it received a copy of the First Amended Complaint in this action. See court record.

**RESPONSE:** TNA does not dispute that it was served with a copy of the First Amended Complaint in this action and had knowledge of Plaintiff's claims as alleged therein after it received a copy of the First Amended Complaint.

126. Steve Campbell testified as follows:

Would TNA do – would In Demand do the synopsis?

A. Yes, In Demand would do the synopsis.

Q. Would they do the synopsis on all these types of ads that would appear on the internet?

A. Yes, it would, of course after In Demand has reviewed the materials that TNA has supplied, but the writing and the drafting of the synopsis is the responsibility of In Demand.

P. Ex. 68, Campbell dep. P 12 line 21 to P 13 line 2.

**RESPONSE:** TNA does not dispute that paragraph 126 accurately quotes Steve Campbell's deposition at pages 12-13.

127. No one gave TNA permission to use SUPERSTARS OF WRESTLING in advertisements. P Ex 68, Campbell dep p 36 lines 13-15

**RESPONSE:** TNA does not dispute that no one gave TNA permission to use SUPERSTARS OF WRESTLING in advertisements.

128. TNA and In Demand split the revenue received for broadcasts of the TNA events on In Demand. P Exhibit 67, O'Neil dep p. 46

**RESPONSE:** TNA disputes that the testimony cited by Plaintiff supports Plaintiff's statement in paragraph 128. TNA does not dispute that TNA and iN DEMAND split the revenue received for broadcasts of the TNA events on iN DEMAND.

129. Mr. O'Neil, the in house accountant, for TNA testified Regarding Exhibit 7 to the O'Neil deposition as to the split of revenue between In Demand and TNA. P Ex 67, P 42-46

**RESPONSE:** TNA disputes that the testimony cited by Plaintiff supports Plaintiff's statement in paragraph 129. TNA does not dispute that TNA and iN DEMAND split the revenue received for broadcasts of the TNA events on iN DEMAND.

130. Mr. O'Neil testified as follows:

Q      On the last page there's a split between the TNA portion and In Demand portion. Do you see that?

A.      Yes Sir.

Do you know how the split was determined or –

A.      Well referencing – knowing some formatting, this would be related to the headings from the first page and not necessarily related to any of this data on the second page Ex 67, O'Neil dep p 46.

**RESPONSE:** Plaintiff does not include a full quotation of Thomas O'Neil's testimony regarding Exhibit 67:

> Q:  On the last page, there's a split between TNA portion and iN DEMAND portion. Do you see that?
>
> A:  Yes, sir.
>
> Q:  Do you know how that split was determined, or—
>
> A:  Well, referencing—knowing some formatting, this would be related to the headings from the first page and not necessarily related to any of this data on the second page because there should have been—if we go back one page to the second to last page, there's account codes going across here at the top of these, and that would be referencing the provision—the revenue account and the provisional accounts that offset that revenue account.

(O'Neil dep. at 46-47, Pl.'s Ex. 67.)

131.  Patterson received a royalty payment of a lump sum amount of $5,000 under the license agreement with Madacy.  P Ex 10, License agreement with Madacy.

**RESPONSE:** TNA does not dispute that Plaintiff's Exhibit 10 is a license agreement between World Wrestling Association, Superstars of Wrestling, Inc. ("Licensor") and Madacy Entertainment Group, Inc. or that Madacy was to pay Licensor $5,000.  Plaintiff's Exhibit 10 does not support Plaintiff's statement that $5,000 was actually paid to Plaintiff by Madacy. Further, Patterson testified that $5,000 was to cover his attorney fees in litigating against Madacy, and that the license agreement was entered into to settle that litigation.  Patterson dep. at 119-124; Ex. R to 9/26/2006 Affidavit of Jennifer Puplava.)

132.  Patterson received a royalty payment of a lump sum amount of $1,500 under the license agreement with Mario Salvoldi.  P. Ex. 40 License agreement with Savoldi.

**RESPONSE:** TNA does not dispute that Plaintiff's Exhibit 40 is a settlement agreement between World Wrestling Association, Superstars of Wrestling, Inc. ("Licensor") and Mario

Savoldi, that Savoldi was to pay Licensor $1,500, and that $1,000 had been paid. Plaintiff's Exhibit 40 does not support Plaintiff's statement that the remaining $500 was actually paid to Plaintiff by Savoldi. Further, Patterson testified that the $1,500 did not even cover the attorneys fees he had incurred in litigating against Savoldi and that the license agreement was part of the settlement of that litigation. (Patterson Dep. at 144-147; Ex. R to 9/26/2006 Affidavit of Jennifer Puplava.)

133. In a Yahoo search by Boutwell on September 9, 2006 using the initials TNA WWE, the search indicated there were about 2,880,000 hits. P Exhibit 70.

**RESPONSE:** TNA does not dispute that Plaintiff's Exhibit 70 is a one page printout purporting to show 2,880,000 hits for TNA WWE.

134. In a Yahoo search by Boutwell on September 9, 2006 using the initials AFL NFL the search indicated there were about 4,850,00002 [sic] hits. P. Exhibit 70.

**RESPONSE:** TNA does not dispute that Plaintiff's Exhibit 70 contains a one page printout purporting to show 4,850,000 hits for AFL NFL.

135. Patterson filed a Motion for a Rule to show Cause against Dale Gagner for using his service mark SUPERSTARS OF WRESTLING in the Eastern District of Wisconsin, Case Number 00-C-951. P. Ex 74.

**RESPONSE:** TNA does not dispute that Plaintiff filed a Motion for a Rule to Show Cause For Violation of An Order of Injunction And For Discovery on June 21, 2006 against Dale Gagner in the Eastern District of Wisconsin.

136. TNA was served with a copy of the Complaint in this action during 2004 and had knowledge of Patterson's claims after it received a copy of the Complaint in this action. See court record. TNA was also served with a copy of the First Amended Complaint in this action

and had knowledge of Paterson's claims as alleged therein after it received a copy of the First Amended Complaint in this action. See court record.

**RESPONSE:** TNA disputes that it was served with a copy of the Complaint in this action in 2004 and had knowledge of Plaintiff's claims after it received a copy of the Complaint in this action. TNA was not named in, and was never served with, the original Complaint in this action. TNA does not dispute that it was served with a copy of the First Amended Complaint in this action and had knowledge of Plaintiff's claims as alleged therein after it received a copy of the First Amended Complaint.

137.     Patterson produced a live professional wrestling entertainment show in or about June or July, 2006 using WORLD WRESTLING ASSOCIATION SUPERSTARS OF WRESTLING service marks at the Old Palmer Theater in Milwaukee, WI. Approximately 150 people were in attendance. P Ex. 72, Patterson affidavit dated September 11, 2006.

**RESPONSE:** TNA does not dispute that Plaintiff's Exhibit 72 supports the statement made in paragraph 137.

138.     An injunction issued against World Wrestling All-Stars, Inc. in favor of Albert Patterson in Case No 02 C 0240 in the Eastern District of Wisconsin dated September 1, 2005 barring World Wrestling All-Stars, Inc. from using WORLD WRESTLING ASSOCIATION, WWA, SUPERSTAR WRESTLING, SUPERSTARS WRESTLING, SUPERSTARS OF WRESTLING, SUPERSTARS OF PRO WRESTLING, WWA SUPERSTAR WRESTLING, WWA SUPERSTARS WRESTLING, WWA SUPERSTARS OF WRESTLING and WWA SUPERSTARS. P Ex 73.

**RESPONSE:** TNA does not dispute that a default judgment was entered against World Wrestling All-Stars on August 31, 2005 enjoining it from using, displaying, licensing or otherwise presenting the marks WORLD WRESTLING ASSOCIATION, WWA, SUPERSTAR

WRESTLING, SUPERSTARS WRESTLING, SUPERSTARS OF WRESTLING, SUPERSTARS OF PRO WRESTLING, WWA SUPERSTAR WRESTLING, WWA SUPERSTARS WRESTLING, WWA SUPERSTARS OF WRESTLING and WWA SUPERSTARS.

## ADDITIONAL FACTS IN REPLY TO PLAINTIFF'S RESPONSE TO TNA'S MOTION FOR SUMMARY JUDGMENT

1.      Numerous entities (other than Plaintiff and TNA) have used and are continuing to use "superstars" in connection with wrestling entertainment advertising.  The websites at Exhibit M to the 9/26/2006 Puplava Affidavit are but a few of the many examples of use of the word "superstars" in connection with wrestling entertainment.  The search results in Exhibit E to TNA's Brief in Support of Motion for Summary Judgment contains a brief synopsis showing how the words "wrestling" and "superstars" are used in 250 websites, and links to such websites.

2.      In response to a document request, TNA provided to Plaintiff the five DVDs produced by TNA which Plaintiff had requested and copies of the cases for these DVDs are attached as Exhibit N to the 9/26/2006 Affidavit of Jennifer Puplava.

3.      Each of the DVD cases at Exhibit N to the 9/26/2006 Affidavit of Jennifer Puplava states "Total Nonstop Action Wrestling presents . . ." and each case clearly displays the TNA logo and TNA website.

4.      On four of the five DVD cases at Exhibit N to the 9/26/2006 Puplava Affidavit, the word "superstars" is not even used to promote the DVD in any manner.  For the last DVD, "the best of jeff hardy," the word "superstars" is used once in this context:

> One of the most electrifying superstars in wrestling "The Charismatic Enigma" Jeff Hardy *joined TNA in 2004* as one of the hottest free agents in history."  (Emphasis added)

5.      On Plaintiff's Exhibit 54, a VHS tape containing a 30-second advertisement produced by TNA, "world wrestling superstars" is not announced as presenting these or any

other TNA events.  Rather, TNA is identified four times during this 30-second advertisement (i.e., once every 7.5 seconds) as the entity promoting the pay-per-view broadcasting.

6.      There is no evidence presented by Plaintiff that anyone actually aired the ad contained in Plaintiff's Exhibit 54 on television.

7.      Plaintiff has failed to demonstrate a single advertisement for a TNA event using Plaintiff's registered composite mark.



Dated:  September 26, 2006

By:  s/Andrew A. Jones
    Andrew A. Jones
    WHYTE HIRSCHBOECK DUDEK, S.C.
    555 East Wells Street, Suite 1900
    Milwaukee, WI 53202
    (414) 273-2100
    (414) 223-5000 (Fax)
    ajones@whdlaw.com

    Douglas A. Donnell (P33187)
    Jennifer A. Puplava (P58949)
    MIKA MEYERS BECKETT & JONES PLC
    900 Monroe Ave., N.W.
    Grand Rapids, MI  49503
    (616) 632-8000
    (616) 632-8000 (Fax)
    ddonnell@mmbjlaw.com

Attorneys for Defendant TNA Entertainment LLC