# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ALBERT PATTERSON,
d/b/a/ WORLD WRESTLING ASSOCIATION,
d/b/a SUPERSTARS OF WRESTLING, INC.,
and d/b/a W.W.A. SUPERSTARS,

        Plaintiff,

        v.                            Case No. 04-C-0192

TNA ENTERTAINMENT, LLC,

        Defendant.

**DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I. PROCEDURAL BACKGROUND

On February 25, 2004, the plaintiff, Albert Patterson, d/b/a World Wrestling Association, d/b/a Superstars of Wrestling, Inc. and d/b/a W.W.A. Superstars ("Patterson"), filed a complaint alleging that multiple defendants, including defendant TNA Entertainment, LLC ("TNA"), had infringed on names and marks which Patterson asserts are his protected property in the arena of professional wrestling.

On March 2, 2004, Patterson filed an amended complaint which contains essentially the same allegations as had been set forth in the original complaint. Patterson's amended complaint asserts that the action "arises under the laws of the United States including the Federal Trademark Act, Section 1051 et. seq. of Title 15 of the United States Code [the Lanham Act], and the laws of the State of Wisconsin relating to unfair competition and to trade name, trade mark and service mark

infringement." (Am. Compl. ¶ 1.)  The amended complaint contains five counts: Counts One, Two, Three, and Four assert a variety of claims based on trade name infringement and unfair competition pursuant to the Lanham Act.  Count Five asserts a trademark infringement claim pursuant to Wisconsin state law, to wit, Wis. Stat. § 132.001 et seq.

After the filing of the amended complaint, Patterson commenced settlement discussions with the various defendants.  Those discussions resulted in settlements with all of the defendants except for TNA.

On May 20, 2005, TNA filed its first motion for summary judgment seeking dismissal of the plaintiff's amended complaint.  TNA's motion was predicated on the undisputed fact that neither TNA nor anyone acting on behalf of TNA had used any of the phrases, marks or trade names set forth in Paragraphs 1, 3, 15, 16, 19, 20, 21, 22, 24 and/or 25 of Patterson's amended complaint and which Patterson claimed were protected under federal or state law.  TNA's sole basis for summary judgment was a set of Requests for Admissions that was served on Patterson on or about February 11, 2005, and in response to which Patterson never served any answers or objections.  In accordance with Fed. R. Civ. P. 36(a), the matters set forth in the Requests were deemed admitted once thirty days had passed from the date on which the plaintiff was served with the Requests.  Patterson acknowledged in his original brief that he "has admitted that Defendant did not use plaintiff's marks verbatim."  (Pl.'s Orig. Br. at 12.)  However, he argued that the marks which the defendant had used, namely "Wrestling Superstars" and "World Wrestling Superstars," were confusingly similar to the plaintiff's marks and therefore TNA had infringed on the plaintiff's marks.

On August 26, 2005, this court granted in part and denied in part the defendant's motion for summary judgment.  The court ordered that the plaintiff was prohibited from pursuing money

2

damages from the defendant for any Lanham Act claim which he is ultimately able to prove against TNA. In making this ruling, the court based its decision on Patterson's inability to prove actual confusion. However, the court denied the defendant's motion seeking dismissal of the amended complaint and this action in its entirety. The court left open the issue of whether the defendant used a mark or name that was confusingly similar to a mark or name belonging to the plaintiff.

A mediation was conducted on December 16, 2005 before Judge Goodstein, which resulted in the parties' agreeing to settle the case. On that same day, counsel for the parties presented to this court an agreed-upon injunction and an agreed-upon order for dismissal, both of which the court signed on December 16, 2005. Judgment was entered by the Clerk of Court on December 19, 2005. However, on January 19, 2006, the defendant filed a "Motion for Relief from Judgment, to Rescind Settlement Agreement, Vacate Injunction, Reinstate Action and for Sanctions." TNA claimed that the settlement agreement was procured by fraud, and urged this court to vacate the judgment pursuant to Fed. R. Civ. P. 60(b). On March 10, 2006, the court granted in part and denied in part the defendant's Motion for Relief. The court vacated the injunction and order of dismissal entered on December 16, 2005, but denied the defendant's motion for sanctions.

On August 11, 2006, TNA filed a motion for summary judgment to dismiss all claims against it. That same day, the plaintiff filed a motion for partial summary judgment to enjoin the use by the defendant of the plaintiff's mark Superstars of Wrestling, as well as combinations thereof, including Superstars of TNA Wrestling and Superstars of Professional Wrestling. The plaintiff also sought damages for the defendant's use of the plaintiff's marks. Patterson also filed a "Motion for Leave to Amend Responses to Defendant's Request to Admit Instanter," relating to the defendant's Requests to Admit from February 11, 2005. All of these motions are now fully briefed and are ready

3

for resolution. For the reasons which follow, TNA's motion will be granted. Patterson's motions will be denied.

## II. FACTUAL BACKGROUND

In accordance with the provisions of Civil Local Rule 56.2(a) (E.D. Wis.), the defendants' motion for summary judgment was accompanied by a set of proposed findings of fact. Likewise, the plaintiff's motion for partial summary judgment was also accompanied by a set of proposed findings of fact. A review of the parties' respective proposed findings and the responses thereto reveal that the following are material and (except where noted) undisputed facts that are relevant to the disposition of the defendant's motion for summary judgment and the plaintiff's motion for partial summary judgment.

TNA is an entertainment company which produces and promotes live professional wrestling events and markets recordings of these events on television and DVD nationwide and internationally. (Defendant's Proposed Findings of Fact ("DPFOF") ¶ 1.) TNA was formed in 2002 and first began to promote its events in mid- to-late 2002. (DPFOF ¶ 2.) TNA produces and distributes DVDs of its wrestling events through a license with Navarre Home Entertainment, and its wrestling events are also broadcast via the Internet through a license agreement with MediaZone. (DPFOF ¶ 3 and ¶ 4.) TNA programs were also telecast via pay-per-view by iN Demand and its affiliates. (DPFOF ¶ 5.) TNA's programs are advertised by approximately 2000 local cable systems throughout the United States. (DPFOF ¶ 8.)

Patterson first used the names Superstars of Wrestling, Superstar Wrestling, and Superstars of Pro Wrestling in connection with wrestling entertainment events in 1979. (PPFOF ¶ 3, 5.) Until 1985, Patterson primarily presented his events through the names United Wrestling Association and

4

Superstars of Wrestling. (PPFOF ¶ 4.) Following United Wrestling Association's bankruptcy in 1985, Patterson continued to promote wrestling entertainment events under Superstars of Wrestling. (PPFOF ¶ 8.) Patterson first incorporated World Wrestling Association (W.W.A.) Inc. in Wisconsin in 1988. Since 1989, T-shirts and caps were generally sold at Patterson's live wrestling events bearing the mark World Wrestling Association Superstars of Wrestling. Patterson purchased the assets of United Wrestling Association in 1992 for $9,500, including the trade names Superstars of Wrestling, Superstar Wrestling, and Superstars of Pro Wrestling. (PPFOF ¶ 9.) Patterson has had zero net income from the use of his claimed marks since 1993. (DPFOF ¶ 12.) He has also not filed an individual tax return since the 1980's, and his business has not filed a corporate tax return since 1993. (DPFOF ¶11.)

Patterson claims that the following names and marks are his protected property in the arena of professional wrestling:

> World Wrestling Association; W.W.A.;World Wrestling Association Superstars; W.W.A. Superstars; Superstar Wrestling; Superstars Wrestling; Superstars of Wrestling; Superstars of Pro Wrestling; W.W.A. Superstar Wrestling; W.W.A. Superstars Wrestling; W.W.A. Superstars of Wrestling; and W.W.A. Superstars of Pro Wrestling.

(DPFOF ¶ 13.)

Patterson registered the following marks with the United States Patent and Trademark Office: World Wrestling Association (Reg. No. 3051928) (In Class 35 for "promoting wrestling competitions of others" and Class 41 for "entertainment services in the nature of wrestling matches; wrestling videotape production; and entertainment services in the nature of ongoing television programs featuring wrestling"); and S*W SUPERSTARS OF WRESTLING service mark (Reg. No. 1857015) (In class 41 for "entertainment services in the nature of television programs featuring

5

wrestling"). (DPFOF ¶ 16; Pl.'s Resp. to DPFOF ¶ 16.) Patterson also obtained state registration for the marks: World Wrestling Association; U.W.A. Super Star Wrestling; and WWA Super Stars of Pro Wrestling (DPFOF ¶ 17.)

Patterson first used the marks WWA and World Wrestling Association on television in 1992 while running a wrestling entertainment television show. The show aired between June 6, 1992 and December 1993 on Channels 55 of Warner Cable and Channel 43 in Waukesha, WI. The show also aired in Beloit, WI, Madison, WI, Appleton, WI, Green Bay, WI, and Rockford, IL. The tradenames Superstars of Wrestling and WWA SUPERSTARS appeared on these broadcasts. (Plaintiff's Proposed Findings of Fact (PPFOF ¶ 18).) Patterson first used the marks World Wrestling Association and WWA on pay-per-view television on June 5, 1992 in a program entitled WWA Superstars of Wrestling. (PPFOF ¶ 21.) A taped show in Waukesha in February 1993 and a taped show in Detroit, MI from August 6-8, 1993 at the Jubilee Festival were also broadcast via pay-per-view in 1993. The marks WWA Superstars of Wrestling and World Wrestling Association Superstars of Wrestling, Inc. were used.

Patterson granted a license to Resort Live, Inc. in 2000 to use the marks Superstar Wrestling, Superstars of Wrestling, and Superstars of Pro Wrestling. ((PPFOF ¶ 48; Pl.'s Ex. 7.) Under this agreement, beginning December 16, 2000 a show featuring Dennis Rodman was aired on television throughout the United States, using the marks World Wrestling Association, WWA, and Superstars of Wrestling. This show was rebroadcast approximately 50 times throughout the United States over the next few months. (PPFOF ¶ 50.)

Outside of the Dennis Rodman program, the frequency of television broadcasts of Patterson's events since 1993 is in dispute. Patterson claims that the mark Superstars of Wrestling was used by

6

Resort Live to broadcast live wrestling events on pay-per-view TV in Australia and in Green Bay, WI, Oroville, CA, and Truloc, CA in August 2000. (PPFOF ¶ 48.) TNA contends that Patterson's affidavit fails to state which of these live events were broadcast on television. Furthermore, TNA contends that, according to Patterson's deposition, he has not personally televised any wrestling events since 1993. (Patterson Dep. at 157-159.) Patterson contends that a 1998 show was taped and broadcast on cable TV in Central Wisconsin in 1998 (PPFOF ¶ 42.)

Patterson entered into a license agreement with Madacy, Inc. to sell videotapes and DVDs using the mark Superstars of Wrestling on April 23, 2003. The merchandise licensed in the agreement was sold at Best Buy, Coconuts, and other retail stores throughout the United States and Canada. (PPFOF ¶ 58.) However, the parties disagree over a purported licensing agreement between Patterson and Mario Savoldi. Patterson contends that, pursuant to the licensing agreement, Superstars of Wrestling DVDs were marketed over the internet on Amazon.com and eBay throughout the United States and Canada, as well as at live wrestling events. (PPFOF ¶ 60-61.) TNA claims this fact lacks documented support. (Def.'s Resp. to PPFOF ¶ 60-61.)

The parties also dispute the frequency of Patterson's live wrestling events since 1994. TNA contends that Patterson testified in his deposition that since 1994 he personally used his marks only in connection with live wrestling events which have occurred only once a year in Milwaukee. (DPFOF ¶ 20; Patterson Dep. at 157-159, 175-176, and 183.) Patterson contends in his proposed findings of fact that on some occasions he presented multiple shows during the same year. He lists five performances in 1995, one performance in 1996, two performances in 1997, two performances in 1998, five performances in 1999 (with four performances being co-performances with Rampage Wrestling), five performances in 2000 (again with four performances being co-performances with

7

Rampage Wrestling), one performance in 2001, two performances in 2002, one performance in 2003, and one performance in 2006. (PPFOF ¶ 35-57, 137.) Attendance ranged from 2500 people for performances at festivals in 1999 and 2000 to 150 people at the performance in June or July of 2006. (PPFOF ¶ 44-45, 137.) Each show featured the mark WWA Superstars of Wrestling. (PPFOF ¶ 35-57.)

Patterson claims that various television and internet ads for TNA wrestling programs infringe on names and marks which are his personal property. These include a television advertisement run in Wisconsin and throughout the United States by DirecTV for TNA's weekly wrestling events. ((PPFOF ¶ 96.) The ad states that the program will feature "the best of NWA and World Wrestling superstars." (Pl.'s Ex. 54.) At the conclusion of the ad, "World Superstars" appears in a graphic, with "NWA" and "TNA" below. Another ad was featured on the iN Demand website for a program premiering June 4, 2003. The ad states in part: "'TNA: Total Nonstop Action' Wednesdays in June. Featuring World Wrestling Superstars and the lovely TNA Girls." (Pl.'s Ex. 49.) TNA televised events scheduled to premiere on August 14, 2005 and September 11, 2005 on iN Demand pay per view were advertised using the words "Superstars of TNA Wrestling." (Pl.'s Ex. 64-65.) A TNA televised event scheduled to premiere June 19, 2005 was advertised using the phrase "In 3 years, they have risen. . conquered. . and emerged as the new superstars of professional wrestling." (Pl.'s Ex. 66.)

TNA televised events scheduled to be broadcast on November 27, December 7, December 11, and December 18, 2002 were advertised using the words "Superstars of Wrestling." Patterson's attorney discovered these ads while conducting research on the internet on or about April 13, 2006.

In 1993, pursuant to a settlement with the World Wrestling Association, Inc., there was a

8

court order enjoining Titan Sports, Inc. from using the phrases Superstars of Wrestling, Superstar Wrestling, and Superstars of Pro Wrestling in connection with wrestling activities. (PPFOF ¶ 10.) The Amended Offer of Judgment also stated that "[t]his offer of judgment does not preclude any party from using the term 'Superstars.'" (Def.'s Ex. G.) Furthermore, an injunction was issued on September 1, 2005 barring World Wrestling All-Stars, Inc. from using any of Patterson's claimed protected marks. In 2003, Patterson filed an action for trademark infringement in federal court against World Wrestling Entertainment. The District Court granted summary judgment in favor of the defendant World Wrestling Entertainment on January 31, 2006. (PPFOF ¶ 23-24.) Patterson also has a pending action against Dale Gagner (PPFOF ¶ 62.)

### III. PLAINTIFF'S MOTION FOR LEAVE TO AMEND HIS RESPONSES TO DEFENDANT'S REQUEST TO ADMIT INSTANTER

The plaintiff seeks to amend his responses to the defendant's Requests to Admit from February 11, 2005. Those Requests for Admissions read as follows:

> 1. **Request for Admission:** Please admit that neither TNA nor anyone acting on behalf of TNA has used any of the phrases, marks or trade names you claim are protected which are identified in paragraphs 1, 3, 15, 16, 19, 20, 21, 22, 24 and/or 25 in your First Amended Complaint.
>         . . . .
>
> 2. **Request for Admission:** Admit that you have no information or evidence to establish or prove your claim that TNA knew of your claim to exclusive use of the phrases, marks and/or trade names identified in your First Amended Complaint.
>         . . . .
>
> 3. **Request for Admission:** Admit that you have no evidence that any member of the public who purchased or viewed a TNA produced event believed that such event was produced, promoted or originated with or by you.

(Def.'s Orig. Mot. for Summ. J., Ex. C at pp. 5-6.)

9

Patterson did not serve any answers or objections to any of the Requests. Consequently, in accordance with Fed. R. Civ. P. 36(a), the matters set forth in the Requests were deemed admitted once thirty days had passed from the date on which the plaintiff was served with the Requests. Patterson seeks to add responses to these three requests for admissions. For Request 1, Patterson seeks to deny to the extent that an advertisement from 2002 contained the words "Superstars of Wrestling," and that various 2005 advertisements used the phrases "Superstars of TNA Wrestling" and "Superstars of Professional Wrestling." (Pl.'s Br. Leave to Amend at 3.) For Request 2, Patterson seeks to deny to the extent that Principal Registration is constructive notice of the registrant's claim of ownership. (Pl.'s Br. Leave to Amend at 4.) For Request 3, Patterson seeks to deny to the extent that Patterson's rights have become incontestable within the meaning of 29 U.S.C.A. 1115. (Pl.'s Br. Leave to Amend at 4.)

"A court, in its discretion, may permit a party to rescind admissions when doing so better serves the presentation of the merits of the case and the party who benefits from the admissions (usually by relying on them) is not prejudiced. *Banos v. City of Chicago*, 398 F. 3d 889, 892 (7th Cir. 2005) (citing Fed. R. Civ. P. 36(b)).

Patterson's motion will be denied because the defendant will be prejudiced by the rescission and the amended responses do not better serve the presentation of the merits of the case. To begin with, Patterson's delay in filing the motion to amend prejudiced the defendant. Patterson filed this motion to amend after the discovery period ended on July 21, 2006, and after the deadline for filing summary judgment motions. TNA relied on these admissions for its earlier summary judgment motion, and this court based its decision granting partial summary judgment on these admissions. By allowing amendments to the earlier admissions, the defendant's costs and efforts in obtaining that

10

decision would be wasted, and old issues would need to be relitigated. Furthermore, the decision and order narrowed the issues in this case, causing the defendant to narrow its scope of discovery in preparation for the summary judgment motion currently before the court. Finally, all of the information presented in the amended responses was easily discoverable well before this motion was filed. Patterson has provided no explanation for his delay.

The amended responses also do not better serve the presentation of the merits of the case. As to Request 1, Patterson's proposed amended response is largely irrelevant to the request. The phrases from the 2005 advertisements are not among any of the phrases, marks, or trade names in the First Amended Complaint. The advertisement which uses the mark "Superstars of Wrestling" is from 2002, but again Patterson has provided no explanation as to why this advertisement was not discovered earlier. As to Request 2, the issue of TNA's knowledge of the marks is largely irrelevant to the disposition of the case. TNA is not arguing that it was unaware of the mark, but rather that it did not actually use the mark and that its use of similar variations did not create a likelihood of confusion. As to Request 3, the plaintiff's response is irrelevant to the issue of actual confusion. The existence of an incontestable mark is not evidence of actual confusion.

## IV. SUMMARY JUDGMENT STANDARDS

A district court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

11

475 U.S. 574, 587 (1986)) (quoting Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment). "Summary Judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). To state it differently, "[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.,* 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

To determine whether genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (quoting *Anderson,* 477 U.S. at 255). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than 'some metaphysical doubt as to the material facts.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932

(7th Cir. 2001) (quoting *Johnson v. University of Wisconsin-Eau Claire*, 70 F.3d 469, 477 (7th Cir. 1995)). A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Id.* (citing *Anderson*, 477 U.S. at 252).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## V. DISCUSSION

The defendant moves for summary judgment arguing that the plaintiff's mark is merely descriptive and not entitled to protection, that its use of the mark is "fair use," that Patterson has abandoned the mark, and that Patterson cannot establish a likelihood of confusion as a matter of law under the Lanham Act. The plaintiff argues that his mark is not merely descriptive, but rather is incontestable due to its federal registration and consistent use. Patterson further argues that TNA willfully used the mark as a trademark, and that this willful use of a protected mark establishes a likelihood of confusion. The plaintiff moves for partial summary judgment seeking an injunction and damages for TNA's alleged willful violation of his marks.

In order to prevail on a Lanham Act claim, "a plaintiff must establish that (1) [his] mark is protectable, and (2) the defendant's use of the mark is likely to cause confusion among consumers." *Packman v. Chicago Tribune Co.*, 267 F.3d. 628, 638 (7th Cir. 2001) (citing *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 461 (7th Cir. 2000)). Plaintiffs must establish these two elements for both trademark infringement and unfair competition claims. *Packman*, 267 F. 3d at 638.

13

Marks are usually classified in categories of generally increasing distinctiveness: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). The last three categories of marks "are deemed inherently distinctive and are entitled to protection." *Id.* A registered mark under the Act "affords a plaintiff one of two presumptions: (1) that [his] registered trademark is not merely descriptive or generic; or (2) that if descriptive, the mark is accorded secondary meaning." *Packman*, 267 F. 3d at 638 (citing *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 936 (7th Cir. 1986)). Under the Act:

> a mark registered on the principal register . . . shall be prima facie evidence of the validity of the registered mark . . . and of the registrant's exclusive right to use the mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein, but shall not preclude another person from proving any legal or equitable defense or defect . . . which might have been asserted if such mark had not been registered.

15 U.S.C. § 1115(a).

The defendant may overcome this presumption of validity "with evidence that the mark is merely generic or descriptive, or that it lacks secondary meaning." *Packman*, 267 F. 3d at 639 (citing *Liquid Controls Corp.*, 802 F.2d at 936). Generic marks are those that "'refer to the genus of which the particular product is a species.'" *Two Pesos*, 505 U.S. at 768 (quoting *Park ' N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985). Marks which are merely descriptive of a product "do not inherently identify a particular source, and hence cannot be protected." *Two Pesos*, 505 U.S. at 769. However, a descriptive mark is entitled to protection under trademark law if it has acquired secondary meaning. *Platinum Home Mortg. Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 728 (7th Cir. 1998).

"Secondary meaning exists 'only if most consumers have come to think of the word not as descriptive at all but as the name of the product.'" *Packman*, 267 F. 3d at 639 (quoting *Blau*

14

*Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 609 (7th Cir. 1986). "A mark acquires secondary meaning when it has been used so long and so exclusively by one company in association with its goods or services that the word or phrase has come to mean that those goods or services are the company's trademark." *Id*. at 641 (citing 2 J. Thomas McCarthy, Trademarks and Unfair Competition § 15:5, at 15-9 (4th ed. 2001)).

In addition to contesting the validity of the mark, the defendant may also invoke the "fair use" defense by showing that the alleged infringement "'is a use, otherwise than as a mark . . . which is descriptive of and used fairly and in good faith only to describe the goods or services of such party . . . .'" *Id*. at 639 (quoting 15 U.S.C. § 1115(b)(4)). "This defense 'is based on the principle that no one should be able to appropriate descriptive language through trademark registration.'" *Id*. (quoting *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 951 (7th Cir. 1992)). The "fair use" defense is available against federally registered trademarks that are "incontestable." *Sunmark, Inc. v. Ocean Spray Cranberries*, 64 F.3d 1055, 1058 (7th Cir. 1995).

The defendant may also invoke the affirmative defense of abandonment, including against "incontestable" federally registered trademarks. 15 U.S.C. 1115(b)(2). A mark is deemed abandoned if one of the following occurs:

> (1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. 'Use' of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.
> (2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph.

15 U.S.C. § 1127.

15

The defense of abandonment results in the "loss of trademark rights against the world. *TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 885 (7th Cir. 1997).

Finally, "even if the mark is sufficiently distinctive to warrant trademark protection, the defendant may still prevail by showing that its use of the mark is not 'likely to cause confusion, or to cause mistake, or to deceive.'" *Packman*, 267 F. 3d at 639 (quoting 15 U.S.C. § 1114(1)(a)).

"In a trademark infringement case, the classification of a word or phrase as descriptive, the determination that a defendant's use was a non-trademark use in good faith, and the finding that consumers are not likely to be confused about the origin of a defendant's products are questions of fact." *Packman*, 267 F.3d at 637.  However, "these issues may be resolved on summary judgment 'if the evidence is so one-sided that there can be no doubt about how the question should be answered.'" *Id.* (quoting *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 171 (7th Cir. 1996).

## A. Responsibility for the Creation of the Advertisements

As an initial matter, the parties disagree over whether TNA was responsible for the creation of one of the advertisements in question.  TNA contends that the advertisement from 2002 using the phrase "Superstars of Wrestling" was created and published solely by Alameda Power & Telecom, a Department of the City of Alameda.  (Def.'s Br. in  Opp'n Part. Summ. J. at 3.)  TNA argues that it has no contractual relationship with Alameda Power & Telecom, and that this company is simply one of the many cable companies which airs pay-per-view events supplied by iN Demand.  Although TNA concedes that it sends media kits to iN Demand for advertisements, TNA argues that the media kit sent to iN Demand did not contain the words "Superstars of Wrestling." (Def.'s Br. in  Opp'n Part. Summ. J. at 3.)  Patterson argues that the licensing agreement between TNA and iN Demand

16

creates an agency relationship between TNA, iN Demand, and Alameda Power. (Pl.'s Reply Br. Part. Summ. J. at 9.)

This court need not decide whether the contract creates an agency relationship under which TNA is liable for Alameda Power's advertisements. This is because, even assuming that TNA were responsible for the advertisement created by Alameda Power, TNA is, for the reasons discussed below, able to prevail on its motion for summary judgment.

**B. Distinctiveness of Plaintiff's Marks**

The defendant argues that the plaintiff has failed to produce evidence that the term "Superstars of Wrestling" or other terms using the term "Superstars" are not simply descriptive or generic. (Def.'s Br. at 22.) TNA further argues that Patterson has produced no evidence indicating that these phrases have acquired secondary meaning. (Def.'s Br. at 23.) In response, the plaintiff argues that the Patent and Trademark Office has determined that "Superstars of Wrestling" is not descriptive since it has been registered since 1994. (Pl.'s Br. at 20.) Patterson contends that, as a result of this registration, his right to use the mark has become incontestable under 15 U.S.C. 1065. (Pl.'s Br. Part. Summ. J. at 3.) Furthermore, the plaintiff argues that the usage of "Superstars of Wrestling" does not conform to the dictionary usage of either "Wrestling" or "superstars." (Pl.'s Br. at 21.)

A mark is incontestable when "such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce." 15 U.S.C. 1065. An incontestable mark is conclusively presumed to have acquired secondary meaning and may not be challenged as merely descriptive. *Park 'n Fly*, 469 U.S. at 196.

17

A descriptive term imparts information directly or is "necessary to the description of the goods or services in question." *M.B.H. Enter.*, 633 F.2d at 54. This is in contrast to "fanciful or coined devices, which are utterly undescriptive, and from 'suggestive' devices, which combine elements of descriptiveness and of fancy." *Id*. If a mark "stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive." *Platinum Home Mortg. Corp.*, 149 F.3d at 727 (quoting *Sands, Taylor & Wood Co.*, 978 F.2d at 947). "A person 'cannot appropriate the English language' and thereby render others inarticulate." *Packman*, 267 F.3d at 641 (quoting *Blau Plumbing*, 781 F.2d at 609); *see also M.B.H. Enter.*, 633 F.2d at 55 (an owner of a registered mark "may not appropriate to itself common English slang terms and thus prevent others from using such phrases in their descriptive sense").

A court may look at various uses of the term to determine its distinctiveness, including: (1) the general use and definition of the term; (2) the plaintiff's use of the term as an alleged trade name or mark of its services; and (3) other businesses' use of the term as a component in their trade names. *See Platinum Home Mortg. Corp.,* 149 F.3d at 727.

In the case at hand, the plaintiff's registration of the mark "S*W SUPERSTARS OF WRESTLING" creates a presumption that the mark is not descriptive or generic, or that it has secondary meaning. The defendant can overcome this presumption with evidence that the mark is descriptive or lacks secondary meaning. However, the defendant cannot overcome this presumption if the mark is incontestable.

To be sure, the phrase "Superstars of Wrestling" is not fanciful or coined, and thus it is either suggestive or descriptive. At issue is whether this phrase stands for an idea which requires some use of the imagination to connect it with the plaintiff's product, or whether it imparts information

18

directly. The defendant argues that this term is inherently descriptive and does not suggest ownership or origin with Patterson. TNA points to use by other wrestling entertainment businesses of the terms "Superstars" in connection with the term "Wrestling." (Pl.'s Br. at 5; Pl.'s Ex. M.) The defendant also offers Patterson's deposition in which he noted that "everyone at this point in time wants to be wrestling superstars or superstars of wrestling" to indicate the general descriptive nature of the phrase. (Pl.'s Br. at 5; Patterson Dep. 86-87.)

The plaintiff argues that the term "Wrestling" in the phrase "Superstars of Wrestling" is not descriptive because it stands for the idea of entertainment services rather than wrestling as a sport. Patterson also argues that "Superstars" is not descriptive because the dictionary definition of "Superstars" refers to only a select few, rather than all performers. Thus, "Superstars" is not descriptive because "Superstars of Wrestling" refers to all performers in the plaintiff's business.

In my opinion, the phrase "Superstars of Wrestling" appears to be largely descriptive. Although "Wrestling" may not refer to wrestling as a sport, it clearly refers to a form of wrestling entertainment commonly referred to as "Wrestling" within that field of business. Furthermore, "superstar," as defined in the American Heritage Dictionary, is "1. A widely acclaimed star, as in movies or sports, who has great popular appeal," or "2. One that is extremely popular or prominent or that is a major attraction." Given that "wrestlers" in the wrestling entertainment business are chosen specifically for popular appeal, rather than as part of an open competition, it is conceivable that all performers could be considered "Superstars" within the dictionary definition of the term.

Although "Superstars of Wrestling" lacks a certain degree of distinctiveness, it is still protectable if it has acquired secondary meaning. In determining if a mark has acquired secondary meaning, a court considers various factors, including "the amount and manner of advertising, volume

19

of sales, the length and manner of use, direct consumer testimony and consumer surveys." *G. Heileman Brewing Co. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 999 (7th Cir. 1989) (quoting *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1085 (7th Cir. 1988).

The defendant argues that Patterson has produced no evidence indicating that the phrases have acquired secondary meaning. While Patterson does not specifically offer evidence addressing the issue of secondary meaning, he has documented his use of the mark since 1978. Patterson's use of the mark, while relatively low in amount, is also relatively consistent. Furthermore, his registration of the mark creates a presumption of secondary meaning in the absence of distinctiveness. Whether his mark has acquired secondary meaning may depend on direct consumer testimony or consumer surveys.

In addition, the parties are in disagreement over what is protected by the federal registration, and whether the mark is incontestable. The defendant argues that only the full mark "S*W SUPERSTARS OF WRESLTLING," with both the picture logo and phrase, is protected by the 1994 registration. (Def.'s Br. in Opp.'n Part. Summ. J. at 5.) TNA also contends that the mark is only protectable with use in television programs, and that the mark is not incontestable since the plaintiff has not used the mark in connection with a television program since 1993. (Def.'s Br. in Opp.'n Part. Summ. J. at 9.) The plaintiff argues that the words "Superstars of Wrestling," even without the logo, are protected by the registration. (Pl.'s Reply Part. Summ. J. at 7.) Patterson further argues that he has used his registered mark in connection with television programs since 1993 through license agreements. (Pl.'s Reply Part. Summ. J. at 2.)

For purposes of summary judgment, this court cannot conclusively decide whether Patterson's mark is incontestable, or whether his mark has acquired secondary meaning.

20

Nevertheless, even assuming Patterson's mark were valid and incontestable, for the reasons set forth below, TNA would still be able to successfully invoke the defense of fair use. Furthermore, even with an incontestable mark Patterson must still establish likelihood of confusion among consumers to prevail on his Lanham Act claims. And once again, for the reasons set forth below, Patterson has been unable to produce sufficient evidence from which a reasonable trier of fact could find likelihood of confusion among wrestling consumers.

## C. Fair Use

The defendants argue that, even if "Superstars of Wrestling" is a protectable mark, their use of the mark is "fair use." In order to prevail on a fair use defense, the defendants must show that: "(1) they used ["Superstars of Wrestling"] in a non-trademark use; (2) the phrase is descriptive of their goods or services; and (3) they used the phrase 'fairly and in good faith' only to describe their goods or services. *Packman*, 267 F.3d at 639 (citing 15 U.S.C. § 1115(b)(4)).

In determining whether a phrase was used in a trademark use, the key question is whether the mark was used to identify the source of the products. *See Packman,* 267 F.3d at 640 (the phrase "The joy of six" did not identify the source of any of the defendants' memorabilia so defendants' use was "otherwise than as a trademark"); *M.B.H. Enter*., 633 F.2d at 54 (radio station's call letters and frequency, not the slogan, identified the source of advertising); *Platinum Home Mortgage Corp*., 149 F.3d at 728 ("platinum" described quality of mortgage services and did not identify particular source or designate specific origin of services).

In my opinion, the defendant's use of the terms "Superstars" and "Wrestling" is a non-trademark use. The advertisements in question do not use the terms to identify the source of the product. Rather, the source of the wrestling entertainment shows is identified as either TNA or the

National Wrestling Alliance.[1]  TNA and NWA are repeatedly referenced within the advertisements, and TNA is often explicitly identified as the source of the program.  Furthermore, only one of these advertisements uses the plaintiff's mark verbatim.  The other advertisements contain variations such as "World Wrestling Superstars" or "superstars of TNA Wrestling." These variations do not identify the source of the advertising as "Superstars of Wrestling," but rather make clear that TNA is the sponsor.

To be sure, one of the advertisements for a program scheduled to be aired in November and December 2002 did contain the exact words "Superstars of Wrestling" in a prominent position.  (Pl. Ex. 63.)  However, directly underneath this phrase was a large "NWA-TNA."  In addition, the program description explicitly states that "the National Wrestling Alliance presents 'TNA: Total Nonstop Action.'"

Furthermore, in my opinion the defendant's use of the terms "Superstars" and "Wrestling" is descriptive of TNA's goods and services.  TNA's use of the terms was to describe who would be performing on the program.  As discussed above, "Superstars of Wrestling" is primarily a descriptive phrase.  Likewise, variations of this phrase, such as "superstars of TNA Wrestling," "superstars of

---

[1] The phrases in question used in the defendant's advertising include: "Featuring Superstars from the National Wrestling Alliance..." (Pl. Ex. J-46.)  "TNA Total Non-Stop Action. . . Featuring World Wrestling Superstars and the lovely TNA Girls.  (Pl. Ex. J-48.)  "If you. . . would like to be the next TNA Wrestling Superstar, e-mail your contact information." (Pl. Ex. G-16.)  "NWA-TNA wrestling is on pay-per-view.  Catch action-packed matches, featuring some of today's World Wrestling Superstars and up-and-comers." (Pl. Ex. G-20.)  "TNA wrestling: best of Jeff Hardy-Enigma, 'one of the most electrifying superstars in wrestling'" (Pl. Ex. P-7.)  "What other sacrifices will the superstars of TNA Wrestling have to make in order to survive this punishing night? TNA Wrestling presents 'Sacrifice'" (Pl. Ex. P-9.)  "[T]he superstars of TNA Wrestling take to the ring . . . TNA Wrestling presents 'Unbreakable'" (Pl. Ex. P-6.)  "In 3 years, they have risen . . . conquered . . . and emerged as the new superstars of professional wrestling.  And on June 19, TNA Wrestling presents its 3rd Anniversary Spectacular."  (Pl. Ex. P-4.)

22

professional wrestling," and "World Wrestling Superstars" are primarily descriptive. Their purpose is to impart information directly.

Lastly, the defendants used the terms "Superstars" and "Wrestling" fairly and in good faith only to describe their goods or services. "Mere knowledge of [plaintiff's] trademark on the phrase is insufficient to establish that the [defendant] acted in bad faith and to preclude summary judgment." *Packman*, 267 F.3d at 642 (citing *M.B.H. Enter.*, 633 F.2d at 54). Rather, good faith "can be judged only by inquiry into [the defendant's] subjective purpose in using the slogan[]." *M.B.H. Enter.*, 633 F.2d at 54.

The plaintiff argues that TNA willfully used his mark after receiving a copy of the complaint in 2004. (Pl.'s Br. at 19.) Although this may be true, this alone fails to establish that TNA acted in bad faith. The plaintiff must have intended to use the phrase as a trademark. TNA's use of its name throughout the ads to indicate the source suggests a lack of intent to use the protected phrase as a trademark.

In *M.B.H. Enter.*, the plaintiff had a registered trademark for the phrase "I LOVE YOU" for services related to radio programs. 633 F.2d at 51. The plaintiff had licensed a promotion using the phrase "I LOVE YOU MILWAUKEE" to the radio station WISN in Milwaukee. *Id*. The defendant radio station WOKY began its own campaign, and used the phrases "WOKY LOVES MILWAUKEE" and "I LOVE MILWAUKEE." *Id*. at 52. In holding that WOKY did not act in bad faith, the court found that WOKY's use of its call letters and radio frequency to identify WOKY as the source in each of the ads suggested that WOKY did not intend to use the phrases as trademarks. *Id*. at 54-56. Similarly, in the case at hand the defendant's use of its company name TNA as the

23

source in each of the ads indicates that it did not intend to use "Superstars of Wrestling" as a trademark.

Furthermore, in his previous admissions Patterson conceded he had "no information or evidence to establish or prove [his] claim that TNA knew of [his] claim to exclusive use of the phrases, marks, and/or trade names identified in [the] First Amended Complaint." (Request for Admission #2.) Although the plaintiff points to TNA's use of similar phrases since the 2004 complaint, TNA has not used any phrases verbatim. The only ad which uses the exact phrase "Superstars of Wrestling" is from 2002, well before TNA was served with the amended complaint.

In sum, the evidence is so one-sided that there can be no doubt about whether the defendant's use of the marks was fair use. The plaintiff has failed to present evidence indicating that the terms were not used in a descriptive, non-trademark sense, or that the defendants acted in bad faith. However, even without a finding of fair use, the defendant would nevertheless still be able to prevail on summary judgment because, as is explained in more detail below, Patterson has been unable to produce sufficient evidence from which a reasonable trier of fact could find likelihood of confusion among wrestling consumers.

**D. Likelihood of Confusion**

Even if Patterson's were able to show his claimed marks are protectable, he still must establish that TNA's use of the marks is likely to cause confusion among consumers. The typical case involves "forward" confusion, in which "the junior user attempts to capitalize on the senior user's good will and established reputation by suggesting that his product comes from the same source as does the senior user's product." *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*,

24

188 F.3d 427, 436 (7th Cir. 1999) (quoting *Ameritech, Inc. v. American Information Technologies Corp.*, 811 F.2d 960, 964 (6th Cir. 1987).

> However, in the case at hand Patterson is relying on the doctrine of reverse confusion.
>
> Reverse confusion occurs when a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user. In such a case, the junior user does not seek to profit from the good will associated with the senior user's mark. Nonetheless, the senior user is injured because the public comes to assume that the senior user's products are really the junior user's or that the former has become somehow connected to the latter. The result is that the senior user loses the value of the trademark--its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.

*Id*. at 436-37 (quoting *Ameritech, Inc.*, 811 F.2d at 964).

A likelihood of confusion analysis consists of seven factors: "(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the plaintiff's mark; (6) actual confusion; and (7) intent of the defendant to "palm off" his product as that of another." *Packman*, 267 F.3d at 642 (citing *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 897-98 (7th Cir. 2001). Although no single factor is dispositive, "in many cases, the similarity of the marks, the defendant's intent, and actual confusion are particularly important." *Id*. (citing *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1044 (7th Cir. 2000).

### 1. Similarity of the Marks

When determining if two marks are similar, the comparison is made "'in light of what happens in the marketplace,' [and] not merely by looking at the two marks side-by-side.'" *Ty, Inc.*, 237 F.3d at 898 (quoting *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1115 (7th Cir. 1997). "If one word or feature of a composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements." *Id*. (quoting *Henri's Food Prods.*

25

*Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 356 (7th Cir. 1983). Furthermore, "[d]ifferent packaging, coloring, and labeling can be significant factors in determining whether there is a likelihood of confusion." *Packman*, 267 F.3d at 644. However, it is "'inappropriate to focus on minor stylistic differences to determine if confusion is likely' if the public does not encounter the two marks together." *Ty, Inc.*, 237 F.3d at 898 (quoting *Meridian Mut. Ins. Co.*, 128 F.3d at 1115).

To be sure, the words used by the defendant and plaintiff are similar, and in one instance identical. However, identical words alone do not necessarily mean the marks are so similar that there will be a likelihood of confusion. In *Packman*, both the plaintiff and the defendant, the Tribune newspaper, used the words "the joy of six" on T-shirts. 267 F.3d at 644. The court, in holding that the marks were not confusingly similar, found that the Tribune's masthead was prominently displayed on the shirts and that the words' appearance and placement were different. *Id*. Similarly, in *M.B.H. Enter.* the court held that despite the identical words of "I Love You" in both parties' slogans, the parties' marks were not confusingly similar because the defendant radio station prominently displayed its call letters and frequency. 633 F.2d at 54.

In the case at hand, the defendant's mark is distinguishable from the plaintiff's mark. The defendant prominently displayed its company name as the source of the wrestling entertainment program. Furthermore, the appearance and placement of the words are different within the advertisements and wrestling events. Patterson uses his mark "Superstars of Wrestling" prominently at his events to indicate the source of the wrestling program. TNA uses these words within the text of the advertisements, and not as a prominent trademark with a picture logo. The salient portion of the defendant's mark is "TNA" rather than the terms "Superstars" or "Wrestling," which merely provide a description of the event. In the marketplace of wrestling entertainment, consumers most

26

likely focus on the mark "TNA" to determine the source of the program rather than the non-salient words surrounding "TNA." As Patterson is relying on reverse confusion, he is arguing that consumers assume that Patterson's products are from TNA due to the confusingly similar marks. However, it is unlikely that Patterson's use of "Superstars of Wrestling" without any mention of "TNA" would lead consumers to assume that TNA is the sponsor. Patterson has not presented any evidence indicating that consumers would find the marks confusingly similar despite the numerous mentions of "TNA" as the source of the advertisements. In sum, the defendant's prominent use of "TNA" in its advertisements weighs against a finding that the marks are confusingly similar.

Also of note is a decision by the Trademark Trial and Appeals Board ("TTAB") regarding a challenge by Patterson of Titan Sports' mark "WWF Superstars" in 1999. The TTAB held that when comparing "WWF SUPERSTARS, with 'Superstars' disclaimed, and Plaintiff's pleaded marks, there is no basis for finding a likelihood of confusion among consumers. We hold as a matter of law, that there would be no likelihood of confusion among consumers." (TTAB Opinion, Ex. I at 8, 9.) Patterson did not appeal this decision. (Patterson Dep. at 100.)

**2. Similarity of the Products**

"In assessing whether products are similar, the question is 'whether the products are the kind the public attributes to a single source.'" *Ty, Inc*., 237 F.3d at 899 (quoting *McGraw-Edison Co. v. Walt Disney Prods*., 787 F.2d 1163, 1169 (7th Cir. 1986)).

In the instant case, both the plaintiff and defendant produce wrestling entertainment events. However, the defendant argues that the plaintiff's promotional efforts are primarily directed towards live, local wrestling events in southeast Wisconsin, and that in contrast TNA primarily produces a

27

television and DVD product.  The plaintiff argues that he also licenses his marks for DVDs, and that regardless the wrestling entertainment itself offered by both parties is similar.

It is conceivable that the public would attribute live wrestling events and television events to a single source.  Although the live events of TNA are staged only in Nashville or Orlando, it is possible that consumers could think they would stage a live event in southeast Wisconsin.  In a general sense, wrestling entertainment is the kind of product the public could attribute to a single source.  However, the scale of each wrestling production may weigh against the possibility for confusion.  TNA produces a larger scale product with nationally recognized performers that are seen regularly on television.  Patterson's shows are smaller in scale with more regional performers.  It is debatable whether the public would think the same source would produce both a national television show and a small-scale, local wrestling event.  As neither side has tangible evidence to support its position in the form of surveys or similar evidence, this factor does not weigh heavily for or against a finding of likelihood of confusion.

### 3. Area and Manner of Concurrent Use

In assessing the factor of area and manner of concurrent use, "we have to assess whether 'there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties.'"  *Ty, Inc.*, 237 F.3d at 900 (quoting *Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 442 (7th Cir. 1990)).  The court may consider several factors, including the "relative geographical distribution areas," "whether there exists evidence of direct competition between the products," and "whether the product is sold through the same marketing channels."  *Id.*

To be sure, the defendant's product has a much larger geographical distribution area through its nationally televised programs and DVD sales.  The plaintiff's product is primarily limited to

28

southeast Wisconsin. However, both market their products in Wisconsin, and the plaintiff has attempted to broaden the scope of his business through DVD sales and licensing agreements.

There appears to be some degree of direct competition between the products. Both products appeal to the same group of consumers, who may be choosing whether to watch a wrestling performance on pay-per-view or live. Although he has not been entirely successful, Patterson has also tried to use his mark by entering into licenses for national television broadcast and DVD sales. He claims that TNA's use of his mark prevents him from licensing his mark nationally, indicating a certain degree of direct competition. (Pl.'s Br. at 16.) However, the level of competition is diminished by the different mediums of the wrestling programs. Consumers are not choosing between directly competing television shows or live events. TNA does not stage any live events in Wisconsin, and Patterson does not currently produce any cable television or pay-per-view events.

The products are also not sold using the same marketing channels. TNA advertises nationally on cable television and the internet. In contrast, Patterson does not advertise on cable television or the internet, and primarily advertises its live events through local channels. As both sides have evidence in their favor, this factor does not weigh heavily for or against a finding of likelihood of confusion.

### 4. Degree of Care Likely to be Exercised by Consumers

Confusion is less likely "where consumers are sophisticated, deliberative buyers." *Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1217 (7th Cir. 1997). Since there is a large amount of variance in consumer competence, "it would be undesirable to impoverish the lexicon of trade names merely to protect the most gullible fringe of the consuming public." *Id*.

29

The defendant argues that consumers of wrestling entertainment are sophisticated, deliberate buyers. TNA offers as evidence the Affidavit of Andy Barton, who states:

> I have seen that the consumers of these wrestling events are highly knowledgeable and sophisticated regarding professional wrestling programming and merchandise, that they easily distinguish between different promoter's wrestling-related products, and that they would not be confused as to the source of such products.

(Barton Aff. ¶ 8.) Barton bases this statement on his "years of experience marketing wrestling events to consumers." *Id*.

Patterson contests the admissibility of Barton's Affidavit, arguing that it is based on Barton's belief rather than his knowledge. (Pl.'s Br. at 17.) As an example, Patterson cites Barton's statement that "I am confident that wrestling consumers would not interpret these advertisements as promoting or advertising any product of Patterson." (Pl.'s Br. at 17.)

Barton's statement is the only evidence offered by either party regarding the degree of knowledge and sophistication of consumers. It is based on his personal knowledge as a marketer of wrestling events. Thus, the court deems it to be admissible. It does show (by way of the marketing of wrestling, with its emphasis on particular star performers and wrestling organizations) that consumers are sophisticated regarding how they choose particular wrestling products.[2]

---

[2]Of note, although not controlling, is a decision by the United States District Court for the Eastern District of Wisconsin granting summary judgment in favor of the defendant World Wrestling Entertainment, Inc. in a trademark infringement suit filed by Patterson in 2003. The court, in analyzing the factor of degree of care likely to be exercised by consumers, found that:

> The sole evidence on the degree of care exercised by consumers, is that wrestling fans are highly knowledgeable and loyal with respect to professional wrestling programming and merchandise. Such evidence indicates that the relevant consumers are sophisticated and would be careful in choosing wrestling events and related products. In other words, they would likely be able to differentiate the parties' respective products.

*Patterson v. World Wrestling Entm't, Inc.*, 2006 U.S. Dist. LEXIS 7453, *80-81 (E.D. Wis. 2006).

Patterson contends that wrestling consumers lack sophistication and knowledge about the performances because they are unable to recognize that wrestling is a scripted performance rather than an actual athletic competition. (Pl.'s Br. at 17.) This argument is unavailing, as the general lack of sophistication of wrestling consumers is irrelevant to the issue of whether they are sophisticated in regards to purchasing wrestling products. Consumers may still be able to differentiate between their favorite wrestling performers and their respective wrestling organizations even if they think the competition is real. In sum, this factor weighs against a finding of a likelihood of confusion.

## 5. Strength of the Plaintiff's Mark

"The stronger the trademark the greater protection received from the courts." *Nike, Inc. v. "Just Did It" Enters.*, 6 F.3d 1225, 1231 (7th Cir. 1993). The strength of a trademark "refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular . . . source." *Eli Lilly & Co.*, 233 F.3d at 464 (quoting *Sands, Taylor & Wood Co.*, 978 F.2d at 959). A widely used descriptive phrase is a weak mark not entitled to trademark protection. *Blau Plumbing*, 781 F.2d at 610. Furthermore, in reverse confusion cases "it may make more sense to consider the strength of the mark in terms of its association with the junior user's goods." *Sands, Taylor & Wood Co.,* 978 F.2d at 959.

Patterson argues that his mark is strong because it has been registered for 12 years. (Pl.'s Br. at 18.) Patterson further argues that a mark with relatively narrow usage is protectable as a inherently distinctive mark. (Pl.'s Br. at 18; *citing Lane Capital Management, Inc. v. Land Capital Management*, *Inc.*, 192 F.3d 337 (2nd Cir. 1999); *Sheila's Shine Products, Inc. v. Sheila Shine, Inc*., 486 F.2d 114 (5th Cir. 1973)). In response, the defendant argues that the use of the word "Superstars" in conjunction with "Wrestling" is virtually universal with no distinctiveness, and thus

31

the plaintiff's mark is weak. TNA offers as evidence the results of a Google search revealing hits for "Wrestling Superstars." (Pl. Br. at 16.) These include websites for multiple wrestling organizations which use the terms "Superstars" in conjunction with "Wrestling."[3] TNA further points to the plaintiff's conceding in his brief that TNA's mark is strong in comparison to Patterson's mark. (Def.'s Reply Br. at 8; Pl.'s Br. at 15.) The defendant also argues that Patterson's registered trademark is the composite mark "S*W SUPERSTARS OF WRESTLING," and that there is no evidence the plaintiff has used this exact mark. (Pl.'s Reply Br. at 9.)

In my opinion, the plaintiff's mark is a relatively weak mark. Indeed, the distinctiveness of the mark is questionable, as it appears to be largely descriptive. Although there may be secondary meaning, there is a lack of supporting evidence as to the extent the public associates the mark with Patterson's product. And, even assuming that Patterson's mark has become incontestable, Patterson's mark is not necessarily strong. *See Munters Corp. v. Matsui Am., Inc.*, 909 F.2d 250, 252 (7th Cir. 1990) (holding that it is still proper for a court to consider strength of a plaintiff's mark when it is incontestable to determine likelihood of confusion).

Furthermore, evidence of the specific websites offered by the defendant does suggest widespread use of "Superstars" in conjunction with "Wrestling." This indicates a lack of distinctiveness and an unlikelihood that the public would identify the shows using these terms as coming from Patterson. Under a reverse confusion analysis, the strength of the mark is still relatively weak. More particularly, it is unlikely that the public associates products containing the words

---

[3]The defendants provide websites found through the Google search in Exhibit M. These include the New England Championship Wrestling ("dedicated to presenting the next generation of pro wrestling superstars."); the website for "National Wrestling Superstars;" the website for "Independent World Wrestling Superstars;" the website for "Women of Wrestling Superstars;" AWA Wrestling Entertainment, Inc. ("Wrestling Superstars Live"); All Pro Wrestling ("SuperStar Profiles"); and World Wrestling Entertainment ("WWE Superstars").

"Superstars" and "Wrestling" with TNA programs. The mark "TNA" is the strong mark in relation to the plaintiff's mark "Superstars of Wrestling." In sum, this factor weighs against a finding of a likelihood of confusion.

## 6. Actual Confusion

This court has already stated in its August 26, 2005 Decision and Order that it is undisputed that "the plaintiff has no evidence that any member of the public who purchased or viewed a TNA produced event believed that such event was produced, promoted or originated with or by the plaintiff." (Decision and Order at 6; Def.'s Request to Admit #3.) Although Patterson contends that continuous use of a registered trademark establishes a presumption of actual confusion, he cites no legal authority supporting this contention. (Pl.'s Br. at 19.) Regardless, the plaintiff has already admitted that he has no evidence that actual confusion exists. Accordingly, this factor weighs against a finding of a likelihood of confusion.

## 7. Defendant's Intent

The factor of intent "looks primarily for evidence that the defendants are attempting to 'pass off' their products as having come from the plaintiff." *Packman*, 267 F.3d at 644. The copying of a descriptive phrase is consistent with the intent to inform consumers about characteristics of its own product, and not to pass off. *Id.* (citing *Liquid Controls*, 802 F.2d at 940). A defendant's knowledge of the plaintiff's mark does not necessarily show the intent to pass off. *Id.* (citing *Barbeque Marx*, 235 F.3d at 1046).

As discussed above in the "fair use" analysis, the plaintiff argues that the defendant willfully used the plaintiff's mark after being served with a copy of the amended complaint. However, as is also discussed above, TNA prominently displayed its company name in all of its advertisements, and

33

used the phrase to inform consumers of the contents of the programs rather than to identify the source. This evidence weighs in favor of a finding of good faith. By contrast, the plaintiff's conclusory assertions of bad faith are not supported by evidence in the record.

Patterson argues that while TNA did not intend to pass off their products as coming from the plaintiff, it did intend to acquire his mark for its own use and pre-empt the plaintiff from using the mark. (Pl.'s Br. at 19.) In a reverse confusion case, "the defendant by definition is not palming off or otherwise attempting to create confusion as to the source of his product." *Sands, Taylor & Wood Co.*, 978 F.2d at 961. Thus, Patterson may be correct in his statement that there is a different analysis in a reverse confusion situation. However, Patterson has produced no evidence supporting the allegation that TNA intended to pre-empt the plaintiff from using the mark. Patterson admitted that he had no evidence to prove TNA's knowledge of his claim to exclusive rights to the mark prior to the service of the Amended Complaint. Furthermore, TNA has not used any of the plaintiff's registered phrases verbatim since service of the complaint. In sum, this factor weighs against a finding of a likelihood of confusion.

Patterson has failed to present tangible evidence to support his assertions that consumers are likely to be confused by TNA's use of the phrases in question. Furthermore, the evidence weighs heavily against a likelihood of confusion when analyzing the three most critical factors: similarity of the marks, actual confusion, and the defendant's intent. As a result, when considering all the evidence in the light most favorable to Patterson, there is insufficient evidence upon which a jury could reasonably find for Patterson on the issue of likelihood of confusion.

**E. Plaintiff's Motion for Partial Summary Judgment**

34

The plaintiff has filed a motion for partial summary judgment claiming he is entitled to an injunction and to damages for the defendant's willful violation of Patterson's marks. (Pl.'s Br. Part. Summ. J. at 4.) Patterson requests both a modification of this Court's earlier order precluding damages and a new order for discovery and expert witnesses in a bifurcated hearing on the issue of damages regarding TNA's use of "Superstars of Wrestling," "Superstars of TNA Wrestling," and "Superstars of Professional Wrestling." (Pl.'s Br. Part. Summ. J. at 6.) The plaintiff bases these requests on recent internet research uncovering verbatim use by TNA of his mark "Superstars of Wrestling" in a 2002 advertisement, and by TNA's use of the phrases "Superstars of TNA Wrestling" and "Superstars of Professional Wrestling" in advertisements after being served with the amended complaint.

Patterson has produced no additional evidence to warrant a modification of this Court's earlier order that he cannot recover damages for any Lanham Act claim against TNA. This is because in a Lanham Act case where the plaintiff is seeking money damages, a plaintiff must prove actual confusion. *Web Printing Controls Co. v. Oxy-Dry Corp.*, 906 F.2d 1202, 1204-05 (7th Cir. 1990). Patterson's failure to respond to Request for Admission number 3 amounted to an admission that he has no evidence of actual confusion. As noted above in the discussion of the Motion for Leave to Amend his Responses to Defendant's Request to Admit Instanter, Patterson cannot rescind his admission.

The plaintiff's request for an injunction will also be denied. As discussed above, TNA is able to prevail on summary judgment by virtue of the fair use defense. Furthermore, even without the fair use defense, Patterson has failed to present evidence to establish a genuine issue of material fact as

35

to the likelihood of confusion. Without a Lanham Act violation, an injunction would be inappropriate.

**F. State Law Claims**

Patterson also has asserted a claim of trademark infringement under Wisconsin state law. The factors of analysis for likelihood of confusion under a Wisconsin statutory trademark claim are identical to those applied in a federal Lanham Act case. Therefore, TNA is also entitled to summary judgment dismissing Patterson's state statutory claim.

## VI. CONCLUSION AND ORDER

In conclusion, and for all of the foregoing reasons, the defendant's motion for summary judgment will be granted, and the plaintiff's motion for partial summary judgment will be denied. The plaintiff has failed to provide evidence such that a reasonable jury could find a Lanham Act violation. Most significantly, Patterson has failed to provide sufficient evidence to establish a likelihood of confusion among consumers.

**NOW THEREFORE IT IS ORDERED** that the defendant's motion for summary judgment be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that the plaintiff's motion for partial summary judgment be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that the plaintiff's motion for leave to amend his responses to defendant's request to admit instanter be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**;

**SO ORDERED** this 27th day of October 2006, at Milwaukee, Wisconsin.

36

_____ /s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

37